PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 08-4427
_____

UNITED STATES OF AMERICA

v.

JOSEPH R. LEE,
                              Appellant
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 06-cr-162)
District Judge: Honorable Donetta W. Ambrose

_____

Argued January 29, 2010

Before:   RENDELL and JORDAN, *Circuit Judges*, and
              PRATTER, *District Judge*.*

(Filed : July 14, 2010)


 *Honorable Gene E.K. Pratter, United States District Court
Judge for the Eastern District of Pennsylvania, sitting by
designation.

Renee Pietropaolo   [ARGUED]
Federal Public Defender's Office
1500 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA   15222
          *Counsel for Appellant*


Robert L. Eberhardt
Rebecca Ross Haywood   [ARGUED]
United States Attorney's Office
700 Grant Street - #4000
Pittsburgh, PA   15219
          *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

Joseph R. Lee was convicted in the United States District Court for the Western District of Pennsylvania of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and was sentenced as a career offender to 120 months' imprisonment.  He appeals both the conviction and his sentence.  For the following reasons, we will affirm Lee's conviction but vacate his sentence and remand for re-sentencing.

## I. Background

### A. *The Stop*

On June 27, 2005, Lieutenant Kevin Kraus of the City of Pittsburgh Police Department traveled to the 2400 block of Webster Avenue in the Hill District of Pittsburgh, Pennsylvania to investigate a homicide that had occurred there the day before. Kraus was in an unmarked police car when he observed Lee, driving a blue Jeep Grand Cherokee, run a stop sign.[1]

Kraus activated his siren and followed Lee to stop him for the traffic violation. Lee abruptly pulled over, and, according to Kraus, began making "rapid, suspicious movements," and reaching "down towards his torso area" as Kraus approached the car on foot. (*Id.* at 349.) All of the windows of the Jeep were down and the sunroof was open. Kraus scanned the car, and noticed a "rather large black heavy coat ... [with] a distinctive flap on the top" in the backseat of the Jeep. (*Id.* at 351.) He also noticed that the coat "appeared to be partially wrapped around ... a long, narrow object." (*Id.* at 351-52.) He took particular note of the coat because the temperature was over 90 degrees that day. Kraus further observed that Lee was wearing a tan bullet-proof vest and was not wearing a shirt. Lee volunteered that he had been trying to take off the bullet-proof vest. Kraus ordered him to raise his hands above his head

---

[1]Lee has never been a suspect in the murder investigation, and "just happened to be driving down the same block" the day after the murder. (App. at 422.)

and place them where Kraus could see them. According to Kraus, at that moment, he saw what he believed to be a black semi-automatic pistol lying on Lee's right thigh. After seeing the object, Kraus drew his own gun and told Lee: "Get your hands in the air. Don't move." (*Id.* at 353-54.) In response, Lee grabbed the steering wheel, said that he had to go, and sped away from the scene.

Kraus called the police dispatcher, reported that he had an emergency, and provided a description of Lee and the Jeep. Shortly thereafter, Kraus learned that another officer had found a Jeep Grand Cherokee matching the description of Lee's car. It was in a parking lot at the rear of the Christopher A. Smith Terrace Apartments (the "Apartments"), about a tenth of a mile from where Kraus had stopped Lee. Lee later stipulated that he abandoned the Jeep where the police found it.

B.    *The Search*

Kraus went to the parking lot at the Apartments and identified the Jeep as the one that he had earlier stopped and in which Lee had fled. All the windows were still down and the sunroof remained open. The bullet-proof vest was lying on the passenger side of the vehicle. However, the coat and long slender object that Kraus remembered seeing in the backseat were no longer there. Four other officers were at the scene to aid Kraus in the investigation. During a search of the area, one of them, Kevin Faulds, found an AK-47 assault rifle beside a fence separating the Apartments from the next door Francis Court Housing Complex (the "Housing Project"). Kraus joined Faulds by the fence and observed the AK-47 partially covered

4

in a black coat with a distinctive flap, lying against the fence. Kraus identified the black coat as the one he had seen in Lee's Jeep.

A police bloodhound named Digger and his handler, Officer Rudolph Harkins, soon arrived at the scene. Kraus informed Harkins that the other officers had already located the Jeep, rifle, and coat. Harkins gave Digger the scent of the Jeep's driver by wiping the driver's seat with a swab, offering the swab for Digger to smell, and giving the dog a command to track the scent. Digger then went down a flight of steps, through a parking lot, and came to within ten to fifteen inches of the rifle and the coat. According to Harkins, Digger then "veered to the right along the fence, [and] went down the fence line approximately 20, 25 feet." (App. at 458.) Digger found an area of the fence that had been ripped open, went through the opening, and continued towards the Housing Project on the other side of the fence. He stopped in front of the door of a vacant building in the Housing Project, and, at that point, circled and sat down, indicating that he had lost the scent. The building was searched, but Lee was not found.

C.    *The Arrest*

Approximately two weeks later, on July 12, 2005, Kraus learned that fellow police officers had caught sight of and were pursuing Lee. They finally found him hiding in an apartment. No weapons or contraband were found on Lee at the time of his arrest, nor in the apartment where he was found. The police arrested him, took him to an interview room at the police station, and gave him *Miranda* warnings. He signed a form waiving his

5

*Miranda* rights, and Kraus proceeded to interview him. Lee denied having any guns in his car when Kraus stopped him. However, he acknowledged that he had been wearing a bullet-proof vest. He said that he had started to take off the vest as Kraus approached the car because he wanted to create a diversion so that Kraus would not see a bag of marijuana that was in the car. Lee further explained that he drove away when Kraus drew his gun because he thought Kraus had drawn the gun in reaction to seeing the bag of marijuana. Kraus told Lee that he had not seen any marijuana but rather had seen a black semi-automatic pistol on Lee's lap. Lee responded that what Kraus had seen was actually a "black and silver cell phone flip-style open and extended on his lap." (App. at 414.)

According to Kraus, Lee "insisted that he does not typically own or carry guns. However, he did state that he had access to a lot of guns and would use them against anyone who threatens him or his family." (*Id*. at 417.) Lee also said that he had previously shot at a man named Ernest "Pickles" Harris and that there was a "long time, ongoing violent feud" between their two families. (*Id.*) Finally, while Lee insisted that he did not have any weapons with him during the traffic stop two weeks earlier, he admitted fleeing when Kraus had tried to stop him on an earlier occasion in 2000 or 2001 when Lee did have guns in a vehicle.

D.    *Procedural History*

On May 3, 2006, a grand jury in the Western District of Pennsylvania returned a one-count indictment charging Lee with being a felon in possession of two firearms, a rifle and a pistol,

in violation of 18 U.S.C. § 922(g)(1).[2]  The rifle referred to in the indictment is the AK-47 that was found lying by the fence under a black coat, near the location of Lee's abandoned car. The pistol is what Kraus had allegedly seen on Lee's lap, although no such pistol was ever recovered.

Prior to trial, Lee filed several motions, including a motion to suppress audio tapes of his interviews, a motion to exclude the bloodhound evidence and for a *Daubert* hearing to test the admissibility of that evidence, a motion under Rule 404(b) to exclude the evidence of the bullet-proof vest and Lee's interview statements to Kraus, and a motion for judgment of acquittal with regard to the pistol on the jurisdictional ground that the pistol was not a firearm in or affecting interstate commerce.  With the exception of a limited portion of the

---

[2] The indictment did not designate separate counts and so appears in form to be a single count.  18 U.S.C. § 922(g)(1) provides:

> It shall be unlawful for any person ... who has been convicted in any court of [] a crime punishable by imprisonment for a term exceeding one year ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(1)

404(b) motion that is not relevant to this appeal, the District Court denied all of Lee's motions.

At trial, over Lee's objection, the government introduced the statements that Lee made during his interview with Kraus and evidence that Lee was wearing a bullet-proof vest when he was stopped. Additionally, over objection, the dispatch tapes were played, and a transcript was provided to the jury. Finally, over objection, the District Court admitted evidence of Digger's efforts to track Lee. However, in light of a dispute over whether Digger had alerted at the coat and rifle, the Court noted that the government "agreed to eliminate any reference in the testimony that Digger paused" when he reached them. (App. at 2.)

At the close of the government's case, Lee moved for judgment of acquittal with respect to his alleged possession of the pistol. Even assuming that what Kraus had seen was a pistol, Lee argued, there was no evidence that the pistol had ever traveled in interstate commerce, as is required under 18 U.S.C. § 922(g). The Court denied the motion, and denied it again when defense counsel renewed it at the close of all evidence.

Throughout trial, Lee's defense with regard to the rifle was that it had never been in his Jeep and that he was not the person who disposed of it. Specifically, "[t]he defense (1) attacked the reliability of [Kraus's] observations, (2) offered evidence that others had an opportunity to have hidden the rifle in that crime-ridden area, ... and (3) stressed the complete absence of physical evidence tying Lee to the weapon and coat." (Appellant's Op. Br. at 63.)

The District Court instructed the jury that a conviction could be based on a finding that Lee possessed either a pistol, or a rifle, or both. The Court and the prosecutor told the jury that unanimity was required on any finding of possession as to either weapon, and jury interrogatories treated each weapon as a separate basis of criminal liability. On June 19, 2008, the jury found Lee guilty of possessing the rifle but not guilty of possessing the pistol. The Court subsequently sentenced Lee to 120 months of imprisonment, to be followed by a three-year term of supervised release, and a special assessment of $100. Lee filed a timely notice of appeal, challenging both his conviction and his sentence.

## II.  Discussion[3]

Lee advances six arguments on appeal: first, that "the rifle charge was prejudicially tainted by evidence offered to support the improper ... [pistol] charge"[4] (Appellant's Op. Br.

---

[3] The District Court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and pursuant to 18 U.S.C. § 3742(a)(1), as this is an appeal from a final judgment of conviction and sentence.

[4] As already noted, Lee was charged in an indictment that did not separate charges into distinct counts, so the unlawful possession of both the rifle and pistol were, effectively, part of a single count. The fact that Lee's alleged rifle possession and alleged pistol possession were set forth in a single count would perhaps be problematic in a spillover context, were it not for the

at 19); second, that the District Court erred in allowing the government to introduce evidence that he was wearing a bullet-proof vest at the time he was stopped by Kraus; third, that the District Court erred in allowing Kraus to testify about the interview statements Lee made regarding prior weapons possession; fourth, that the prosecutor committed misconduct during his discussion of Digger, the bloodhound; fifth, that the District Court erred at sentencing by classifying Lee's state misdemeanor conviction for reckless endangerment as a crime of violence, thereby increasing the length of his sentence; and,

---

fact that the District Court and the parties consistently treated the single count indictment as containing two separate charges: the "rifle charge" and the "pistol charge." The alleged rifle possession and the alleged pistol possession were argued separately before the District Court (for example, Lee moved for judgment of acquittal with regard to the alleged pistol possession only), were treated separately by the District Court throughout trial, and were noted separately in both the jury charge and the jury interrogatories. Most significantly, the jury ultimately acquitted Lee of possessing the pistol, but convicted him of possessing the rifle. Finally, the alleged rifle possession and the alleged pistol possession continue to be treated as two separate charges by the parties on appeal. Accordingly, we too will treat the indictment as setting forth two separate charges for purposes of assessing whether evidence of the alleged pistol possession tainted the jury's consideration of whether Lee possessed the rifle. Like the parties, we will use the terms "rifle charge" and"pistol charge" to distinguish the two charges.

sixth, that the felon-in-possession statute is unconstitutional. We address each argument in turn.

A.    *Prejudicial Spillover*

Lee argues that the District Court erred in denying his motion for judgment of acquittal on the pistol charge because there was insufficient evidence that the pistol, even if he had one, traveled in interstate commerce, which is a required element under 18 U.S.C. § 922(g).  Although Lee was ultimately acquitted of the pistol charge, he contends that the District Court's error in permitting that charge to go to the jury entitles him to a new trial on the rifle charge, because the rifle charge was prejudicially "tainted" by evidence submitted to support the pistol charge.  (Appellant's Op. Br. at 25.)  In other words, Lee contends that there was prejudicial spillover from one charge to the other.

i.    *Standard of Review*

The parties begin with a debate about the standard of review we should apply when evaluating a claim that one criminal charge has tainted the jury's consideration of another. Lee argues that we should apply the test articulated in *United States v. Pelullo*, 14 F.3d 881 (3d Cir. 1994), in which we stated that, "[w]hen confronted with a problem of taint, we must 'consider whether the presence of the [invalidated] count had any spillover effect sufficiently prejudicial to call for reversal.'" *Id.* at 897-98 (quoting *United States v. Ivic*, 700 F.2d 51, 65 (2d Cir. 1983)).  We must reverse and allow for a new trial if the jury was "probably influenced," *id.* at 900, or "'was likely to be

confused or relied upon improper evidence' in its deliberations on the remaining counts." *United States v. Murphy*, 323 F.3d 102, 122 (3d Cir. 2003) (quoting *Pelullo*, 14 F.3d at 898). Even though Lee raised the invalidity of the pistol charge at trial, the government, citing *United States v. Wright*, 363 F.3d 237 (3d Cir. 2004), argues that plain error review applies because Lee did not argue prejudicial spillover before the District Court "in any relevant pleading, such as in a motion for a new trial." (Appellee's Ans. Br. at 3.)

The debate is misleading, as it seems to proceed from the mistaken presumption that the test articulated in *Pelullo* is a standard of appellate review. It is not. Rather, it is an analytical approach to assessing whether evidence from one charge unfairly affected consideration of another charge. In particular, we are here tasked with assessing whether what happened – an acquittal on the pistol charge after hearing evidence on it – means that the jury could not have fairly addressed the rifle charge. To answer that question, we employ the *Pelullo* test.

However, acknowledging that *Pelullo* must be applied to evaluate a claim of taint still leaves us to determine what standard of review to employ in a case like this, in which the issue of taint was never raised before the District Court. This appears to be an issue of first impression for us, and so we look to how we address challenges to the sufficiency of evidence as a guide for the appropriate appellate role in appraising post-hoc

12

complaints about a verdict's basis.[5]   Somewhat like an insufficiency of the evidence argument, an argument of taint asserts that, once the allegedly tainted material is removed from the jury's calculus, there is no sound basis to support the remaining charge.

When a sufficiency of evidence challenge has first been made in the District Court, we exercise plenary review on appeal and ask specifically "whether there is substantial evidence that, when viewed in the light most favorable to the government, would allow a rational trier of fact to convict." *United States v. Bornman*, 559 F.3d 150, 152 (3d Cir. 2009) (quotations and citations omitted).  Though plenary, the "standard of review is highly deferential." *Id.*  However, where a defendant does not mount a challenge to the sufficiency of the evidence in the District Court, we review for plain error.[6]  *United States v.*

_____

[5]Raising the issue of taint before the verdict may be difficult as a defense lawyer does not know, pre-verdict, the counts on which the jury will convict or acquit.  Even if a defendant cannot satisfactorily raise the issue of taint before the verdict, however, he can do so in a post-verdict motion.

[6] The plain error standard is met when "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, — S.Ct.—, 2010 WL 2025203, at *1

13

*Guadalupe*, 402 F.3d 409, 410 n.1 (3d Cir. 2005). Analogizing to that standard, we hold that, because Lee did not raise the issue of taint in the District Court, we must evaluate his claim of taint – through application of the *Pelullo* test – under a plain error standard of review.[7]

---

(May 24, 2010) (internal quotations and alterations omitted).

[7] This holding is not at odds with our reasoning *Wright*. In *Wright*, the defendant filed a motion to dismiss certain counts of the indictment, which the district court denied. 363 F.3d at 241. After the jury returned a guilty verdict, the defendant filed a motion for judgment of acquittal, renewing arguments that he had made in his motion to dismiss. *Id.* The district court granted the defendant's motion with respect to certain counts but denied the motion with respect to other counts. *Id.* On appeal, the defendant argued that he was entitled to a new trial due to prejudicial spillover from the evidence that was admitted to prove the counts on which the district court granted judgment of acquittal. *Id.* at 247. We stated that we did not need to reach the merits of the defendant's spillover argument, because the defendant had not raised it before the district court, and Federal Rule of Criminal Procedure 33 authorizes a new trial only on grounds raised by the defendant. *Id.* at 247-48. We reasoned that the district court could not have erred in not granting a new trial based on prejudicial spillover when the defendant never requested a new trial on that ground. *Id.* at 248. However, despite stating that we were not reaching the merits, we proceeded to use the *Pelullo* factors to explain why the spillover argument failed in any event. *Id.* Thus, in *Wright*, our focus

14

As discussed below, we conclude that Lee's claim of taint fails under *Pelullo*, even when employing the more generous plenary standard of review. Accordingly, we have no difficulty concluding that his claim does not succeed under plain error review.

> ii.     *The Merits of the Prejudicial Spillover Argument*

The government contends that Lee's prejudicial spillover argument fails for two reasons. First, the government says that the District Court did not err when it denied Lee's motion for judgment of acquittal as to the pistol charge because there was sufficient evidence to allow that charge to go to the jury. Second, the argument continues, even assuming that the Court erred in denying Lee's motion, the rifle conviction can stand because there was no prejudicial spillover of evidence from the pistol charge.

The government's insistence that there was sufficient evidence to support the pistol charge is not its most persuasive argument. Indeed, it might have been the better part of wisdom not to have pressed for that charge to go to the jury. The pistol was never recovered, and the testimony about its make and, in turn, about whether it had traveled in interstate commerce,

---

was on the language of Rule 33 that requires a defendant who files a motion for a new trial to specify the grounds upon which he seeks a new trial.

turned out to be a bit equivocal.[8] However, we need not address whether it was error to send the pistol charge to the jury because, even assuming it was, the government is correct that no prejudicial taint from that charge spilled over into the jury's consideration of the rifle charge.

An analysis of whether there was prejudicial spillover involves two inquiries. *See United States v. Cross*, 308 F.3d 308, 318 (3d Cir. 2002). First, if "the evidence to prove the overturned count would have been admissible to prove the remaining valid count, the defendant was not prejudiced, and there is no need to consider whether the evidence influenced the

---

[8]For example, the interstate commerce element of the pistol charge rested first on Kraus, who testified that the gun he saw on Lee's lap "appeared" to be a .9 millimeter pistol, based on the size, shape, and barrel of the gun, but he admitted that he was not sure. He also testified that the gun "appeared to be possibly a Beretta [or] possibly a Taurus," but again he conceded that he "couldn't be sure." (*Id.* at 392.) The government also called Mark Willgohs, a special agent with the Bureau of Alcohol, Tobacco, Firearms & Explosives, who testified that Beretta firearms are manufactured in Italy and Taurus firearms are manufactured in Brazil. Willgohs further testified that there are no commercial manufacturers of firearms in Pennsylvania. However, he noted that there are some private manufacturers of firearms in Pennsylvania. Willgohs admitted, as he had to, that, without examining the gun in question, he could not determine whether the gun was made by a private manufacturer or a commercial one.

16

outcome." *Id.* In other words, if, in creating a hypothetical trial as to the valid count only, the evidence of the invalidated count would have been admissible anyway, the analysis ends there. *Id.* If the evidence would not have been admissible, "then we must consider whether the verdict on the remaining count was affected adversely by the evidence that would have been inadmissible at a trial limited to that count." *Id.* "Generally, invalidation of the convictions under one count does not lead to automatic reversal of the convictions on other counts." *United States v. Gambone*, 314 F.3d 163, 180-81 (3d Cir. 2003) (citing *Pelullo*, 14 F.3d at 897).

        As to whether evidence regarding the pistol charge would have been admissible in a trial only about Lee's possession of the rifle, Lee asserts that, had the District Court properly granted him a judgment of acquittal on the pistol charge, evidence relating to the pistol would have been stricken. According to Lee, the only reason for allowing evidence of Kraus's belief that he saw a pistol "would be to demonstrate Lee's propensity to carry firearms ... *i.e.*, a person who carries a pistol on his lap is the type of person who also transports a rifle in his back seat." (Appellant's Op. Br. at 31.) Admission of such propensity evidence, Lee argues, is precisely what Rule 404(b) "is intended to prevent."[9] *Id.* However, even if we assume that evidence

---

[9]Rule 404(b) provides the following:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It

17

regarding the pistol would not have been admissible during a trial on the rifle charge alone,[10] Lee has failed to show that there

> may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

FED. R. EVID. 404(b)

[10] There is at least a plausible argument that the pistol evidence could have been admissible in the absence of the pistol charge because it reveals why Kraus drew his own gun and yelled to Lee, "[g]et your hands in the air," and why Lee, in response, fled the scene. (App. at 353-54.) Kraus testified that seeing a pistol on Lee's lap is what caused him to draw his weapon, which in turn led to Lee's speeding away. Thus, it could be argued that the evidence was part of the chronology of events demonstrating why Kraus took the actions that he did. *See United States v. Ramirez*, 45 F.3d 1096, 1102 (7th Cir. 1995) (recognizing the "intricately related doctrine" under which "evidence of uncharged criminal activity is admissible, even if it does not satisfy the requirements of ... 404(b), if that evidence is intricately related to the facts of the case before the court." (internal quotations, citations and italics omitted)). *But*

18

was any prejudicial spillover.

In *Pelullo*, we established a four-part test to evaluate a spillover claim. We ask

> (1) whether the charges were intertwined with each other ... so as to create substantial confusion on the part of the jury;
> . . .
>
> (2) whether the evidence for the different counts was sufficiently distinct to support the verdict on other separate counts;
> . . .
>
> (3) whether substantially all the evidence introduced to support the invalid conviction would have been admissible to prove other counts, and whether the

---

*cf. Cross*, 308 F.3d at 320 n. 19 (stating that "we express no view on whether 'other acts' evidence that does not directly prove an element of the charged offense may be 'intrinsic' (and thus exempt from Rule 404(b)) if the other acts were 'inextricably intertwined' with the events underlying the charge, so that the evidence is necessary for the jury to understand how the offense occurred"). We do not need to consider the admissibility question, however, because Lee's spillover argument fails even if we accept *arguendo* that evidence of the pistol would not have been admitted in a trial solely about the rifle.

elimination of the count on which the defendant was invalidly convicted would have significantly changed the strategy of the trial;

 . . .

(4) [whether] the charges, the language that the government used, and the evidence introduced during the trial ... are of the sort to arouse a jury ... [and] whether the defendant was branded with some terms with decidedly pejorative connotation ... so that the prejudicial spillover effect is palpable.

14 F.3d at 898-99 (internal citations omitted).

The first *Pelullo* factor asks whether the charges were sufficiently intertwined to create confusion on the part of the jury. *Id.* at 898. Lee argues that the charges did create confusion because a single-count indictment charged him with possessing both the rifle and pistol on the same date, and a single officer described the entire episode. While it is true that the pistol charge and the rifle charge were set forth together in the single-count indictment, and that both allegations arose out of the events of a single day, there was, on this record, no meaningful risk that the jury was confused when asked to consider the two charges.

The proof of the jury's comprehension is that it found Lee guilty of possessing the rifle but not guilty of possessing the pistol. Clearly, it was able to separate the issues and the

charges, and it did so, in keeping with the District Court's instructions. The Court said,

> In order to find the defendant guilty, you must unanimously determine that the defendant specifically possessed the rifle, or the pistol, or both. For example, it is not sufficient for six jurors to agree that the defendant possessed the rifle and the other six to agree he possessed the pistol. Rather, the verdict slip indicates that all jurors must agree on which weapons, if any, the defendant possessed.

(App. at 601-02.) Questions about the pistol and the rifle were also set forth separately in the special interrogatories attached to the verdict form. In addition, in closing argument, the prosecutor emphasized that the jury needed to consider the pistol charge and the rifle charge separately, saying,

> [Y]ou have to find that the defendant possessed the rifle or possessed the pistol or possessed both. That means all of you as a whole. As the Judge told you, six of you can't say, we believe that he possessed the rifle, and the other six say, we believe he possessed the pistol. That's not enough. All twelve final jurors have to determine that the defendant possessed the rifle or possessed the pistol or possessed both.

21

(*Id.* at 615.)  In short, by argument, instruction, and the verdict form, the jury was told to keep the rifle and pistol charges separate, and their verdict proves that they did.

The second *Pelullo* factor asks whether the evidence relating to each charge was sufficiently distinct that a verdict as to one could be supported without reference to evidence regarding the other.  14 F.3d at 898.  Put differently, we must ask whether there was enough independent evidence concerning Lee's possession of the rifle to support that charge.  Lee argues that the government mixed together the pistol and rifle evidence by telling the jury that Kraus had already seen a long slender object concealed on the back seat of Lee's Jeep, and then by asking the jury to infer that what Kraus saw in Lee's lap was a firearm.  Lee points to the prosecutor's closing argument, where he asked the jury, "[h]ow about the fact that there was a gun in the back seat?  Does that lend any more credence to the fact that what was on [Lee's] lap was a gun and not a squirt gun?"  (App. at 615.)

Leaving aside the fact that Lee's logic here is that the rifle evidence was prejudicially spilling over to support the pistol charge, which is the opposite of the point he is trying to make, his argument fails because there was sufficient evidence of his rifle possession that was distinct from any pistol evidence.  Shortly after Lee abandoned his Jeep, the same distinctive black coat that Kraus had seen in the Jeep covering the long, slender object on the backseat was located along a fence near the Jeep, and that coat was covering a rifle.  That very potent evidence stands independent of the allegation that Lee possessed a pistol,

22

as does the evidence of the bloodhound's tracking his scent from the Jeep along a path where the rifle was found.

The third *Pelullo* factor asks us to look at whether the absence of the pistol charge would have affected the defense's strategy in a trial on the rifle charge only. 14 F.3d at 898-99. Lee argues that the error affected his trial strategy because the District Court allowed the jury to base a finding of guilt on probabilities or propensity. In other words, because Lee was accused of having two firearms, the jury was permitted to assume that he probably had at least one. Lee argues that this necessarily influenced his trial strategy, because, if only possession of the rifle been charged and had the judgment of acquittal been granted as to the pistol, the jury would not have needed any instruction about unanimity as to either the rifle or the pistol or both.

> Instead, the defense would have been a straightforward plea for a weighing of the evidence ... . Had evidence supporting the improper handgun charge never been presented or been stricken, the jury would not have been authorized to reach a compromise verdict or rely on propensities but would instead have been forced to weigh the evidence and make credibility determinations.

(Appellant's Op. Br. at 37-38.)

This argument has a crucial factual flaw in its assertion that the jury was authorized to reach a compromise verdict. The

23

jury was repeatedly and explicitly told that they were not permitted to do any such thing, as should be clear from the very instruction that Lee cites.[11] Lee does not identify any additional arguments he would have made or any witness he would have called – or not called – if the trial had been solely on the rifle charge, nor does he describe how his questioning of any witness would have been materially different. In fact, Lee's strategy seems to have been exactly what he says it ought to have been, namely, asking the jury to weigh the evidence and make credibility determinations, focusing on uncertainty in Kraus's testimony, and arguing the paucity of physical evidence. It appears that the jury did not "rely on propensities" as Lee suggests they did, but instead was able to "weigh the evidence and make credibility determinations," because they ultimately acquitted him of the pistol charge.

The final *Pelullo* factor asks whether the pistol charge and its accompanying evidence was pejorative or inflammatory. 14 F.3d at 899. Lee does not offer an argument on this factor, probably because the evidence plainly was neither pejorative nor inflammatory. The evidence was not that Lee threatened Kraus with the pistol, but simply that Kraus saw what he believed to be a pistol on Lee's lap.

Thus, whether or not the District Court erred in denying Lee's motion for judgment of acquittal, all of the *Pelullo* factors indicate that there was no prejudicial spillover from the pistol charge to the rifle charge. Accordingly, Lee is not entitled to a new trial on the rifle charge.

_____

[11]The instruction referred to is the District Court's statement that "[i]n order to find [Lee] guilty, you must unanimously determine that ... [he] specifically possessed the rifle, or the pistol, or both." (App. at 601.)

B.    *The Bullet-Proof Vest*

Lee next argues that the District Court erred when it allowed the government to introduce evidence that he was wearing a bullet-proof vest at the time of the traffic stop, and, further, when it allowed the government to argue, "what goes more with a bullet-proof vest than guns?" (App. at 618.) Lee asserts that this is impermissible propensity evidence under Rule 404(b) and that it is substantially more prejudicial than probative under Rule 403. The District Court ruled that the bullet-proof vest was not excludable under Rule 404(b) because it "is relevant and strong evidence of [Lee's] alleged possession of firearms." (App. at 4.) As a result of the District Court's ruling, both the government's and Lee's briefs focus on whether the bullet-proof vest was admissible under Rule 404(b).

In our view, the admissibility of the bullet-proof vest does not turn on Rule 404(b), because it is not evidence of a separate wrongful act.[12] No one suggested to the District Court or to the jury that Lee's possession of the bullet-proof vest was illegal[13] or otherwise wrongful in and of itself; indeed, there was

[12]Lee says that the bullet-proof vest evidence is evidence of a "prior bad act," but, among other problems with his argument, he is incorrect as a matter of timing. (Appellant's Op. Br. at 45.) His wearing of the vest was not a prior act at all; rather, it was contemporaneous with the gun possession at issue. More to the point, though, Rule 404(b) does not focus on when the other wrongful act may have occurred; it is aimed at keeping out "[e]vidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith," regardless of chronology.

[13]While it can be illegal for a felon to possess body armor, *see* 18 U.S.C. § 931(a) ("[I]t shall be unlawful for a person to

25

no suggestion that there was anything inherently "bad" about possessing or wearing a bullet-proof vest. Lee's wearing of the bullet-proof vest is noteworthy only for what it says about the nature of the object on the back seat of his Jeep. Thus, the bullet-proof vest should, in the first instance, be analyzed under Rules 401 and 402,[14] as circumstantial evidence related to a fact directly in issue, namely, Lee's alleged possession of a firearm. Evidence of the bullet-proof vest supports the inference that the long, slender object beneath the coat on the backseat was a firearm, in the same manner that the presence of a razor and small glassine bags found at a crime scene can support the inference that white powder residue found nearby is cocaine. In both the case of drug paraphernalia and drugs and the case of a bullet-proof vest and a firearm, the relationship between the contraband and the tools sometimes used with contraband

---

purchase, own, or possess body armor, if that person has been convicted of a felony that is ... a crime of violence ... ."), no one has indicated that Lee is the type of felon for whom it would be illegal, and no one argued that Lee had committed an illegal act by having the vest.

[14]Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. Rule 402 states that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." FED. R. EVID. 402.

We review a district court's decision as to the admissibility of evidence for abuse of discretion. *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000).

allows a logical inference to be drawn. In other words, a jury could, after considering Kraus's description of the object on the backseat and Lee's decision to wear a bullet-proof vest, draw an inference that the object was a firearm. The bullet-proof vest is therefore circumstantial evidence upon which the jury could properly move toward a conclusion about gun possession.[15]

Lee next argues that the bullet-proof vest should have been excluded under Rule 403, because "*any* purported probative value was substantially outweighed by the danger of unfair prejudice."[16] (Appellant's Op. Br. at 44 (original emphasis).) Specifically, Lee argues that the prosecutor's accompanying statement – "what goes more with a bullet-proof

---

[15]The government argues that "the fact that Lee was wearing a bullet-proof vest and was attempting to take off the vest when he was approached by Lt. Kraus is admissible because the absence of this fact would create a 'chronological or conceptual' void in the Lt. Kraus's story ... ." (Appellee's Ans. Br. at 41.) However, even without mentioning the bullet-proof vest, there were enough facts in the chronology for a jury to understand why Kraus stopped Lee's Jeep and looked at the backseat, namely, the traffic violation and the furtive movements Lee was making when he was pulled over. Thus, the bullet-proof vest was not necessary to construct a chronology.

[16]Rule 403 states that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403.
Lee gives an alternative explanation for having the vest, namely, that he was wearing it for protection since one day earlier there had been a homicide in the area.

vest than guns?  Does it corroborate the fact that there was a gun in his lap and that there was a gun in the back seat?" – makes the introduction of the bullet-proof vest even more prejudicial than it would have been on its own.  (App. at 618.)

A district court's ruling under Rule 403 may be reversed only if it is "arbitrary or irrational."  *See United States v. Univ. Rehab. Servs. (PA), Inc*., 205 F.3d 657, 665, 669 (3d Cir. 2000) (*en banc*) ("[We] cannot reverse a District Court's conclusion under Federal Rule 403 unless such a conclusion is held to be an abuse of discretion, which we have defined as 'arbitrary or irrational.'" (citing *In re Paoli R.R. Yard PCB Lit.*, 113 F.3d 444, 453 (3d Cir. 1997))).  Here, the Court's ruling was certainly not so infirm.  It, in effect, recognized that the prosecutor was only providing the jury with the inferential step that he hoped would be made:  that Lee had particular reason to protect himself against gun violence by wearing body armor because he was himself carrying a gun.  While prejudicial to Lee, it was not unfairly prejudicial to suggest that bullet-proof vests and guns often accompany one another.

In addition, while we do not think it helpful to view the bullet-proof vest as 404(b) evidence, any concern that the jury might have misinterpreted the relevance of the vest is laid to rest by the District Court's instruction that information related to the vest could only be considered for a limited purpose.[17]  The Court

_____

[17]Limiting instructions are not limited to Rule 404(b) evidence.  They are of assistance in other contexts where the jury needs to be directed to view a piece of evidence solely as it pertains to a specific issue.  *See, e.g.*, *United States v. Jones*, 566 F.3d 353, 359 (3d Cir. 2009) (finding that a court's limiting instruction was sufficient because it "differentiated [the defendant's offenses] from the other offenses connected to his co-defendant"); *United States v. Green*, 556 F.3d 151, 155 (3d

told the jury, twice, that it should consider the bullet-proof vest only for "deciding whether the defendant had the state of mind, knowledge, motive or intent necessary to commit the crime charged, or did not commit the acts for which he is on trial by accident or mistake." (App. at 644-45.) Thus, the Court's limiting instruction encouraged the jury to think of the vest only for what it might imply about whether Lee possessed a firearm when Kraus confronted him.

Given the high degree of deference we owe when reviewing a district court's Rule 403 determination, combined with the legitimate probative value of the evidence and the District Court's limiting instruction, we cannot say that the decision to admit the bullet-proof vest evidence was arbitrary or irrational.

C.      *Lee's Statements Regarding His Prior Possession of Firearms*

Lee next argues that the District Court erred in admitting into evidence the statements he made to Kraus during their interview. Specifically, Kraus provided the following testimony at trial regarding those statements:

> Lee insisted he does not typically own or carry guns. However, he did state that he has access to a lot of guns and would use them against anyone who threatens him or his family. He stated that he shot at an individual named Pickles, who was well

---

Cir. 2009) (discussing limiting instructions in the context of admitting a piece of evidence under one of the exceptions to the hearsay rule); *Vazquez v. Wilson*, 550 F.3d 270, 279 (3d Cir. 2008) (discussing the use of limiting instructions in the context of alleged *Bruton* violations).

known as Ernest Harris, on multiple occasions. He went on to say that I arrested Pickles, which is true, in the past, with a firearm. And Mr. Lee claimed that on that night, that ... Pickles was arrested, that Pickles was actually on his way with that gun to kill Mr. Lee. He acknowledged that and said that there's a long time, ongoing violent feud between Mr. Lee's family and Pickles. ... Lee continued to insist that he did not have any weapons in the car when I stopped him on June 27th, but he did compare that to a time when he stated that he fled from me before in the Hill District. ... I do remember this. It would have been probably back in 2001 or 2002. ... He further told me that if I would have caught him that night, I would have caught him with guns in the car, but, again, he continued to insist that he had no guns in the car on June 27th when I stopped him.

(App. at 417-18.) In short, Lee admitted that he had access to guns, that he was willing to use guns, that he had shot at someone with whom he had an ongoing feud, that that person had tried to kill him, and that he had possessed a gun at an earlier time when Kraus tried to stop him. Lee attempted to exclude those statements as impermissible evidence under Rule 404(b), arguing that they do nothing but show a propensity for unlawful gun possession. The District Court denied that motion and held that the statements were "admissible to prove intent, knowledge and/or the absence of mistake. Defendant has denied possession of the firearms in question here." (*Id*. at 5.)

On appeal, Lee again argues that his statements constitute impermissible propensity evidence under Rule 404(b). "To the extent that our review of the district court's Rule 404(b) ruling requires us to interpret the rules of evidence our review is plenary, but, if the evidence could have been admissible in some circumstances, we would review the district court's decision to admit evidence ... for an abuse of discretion." *United States v. Daraio*, 445 F.3d 253, 259 (3d Cir. 2006) (citation omitted).

The Supreme Court has created a four-step test for the admissibility of evidence covered by Rule 404(b):

> (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it is admitted.

*United States v. Sampson*, 980 F.2d 883, 886 (3d Cir. 1992) (citing *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988)). Only the first, third, and fourth steps are contested here, as it is undisputed that, under step two, Lee's statements are relevant.[18]

### i.       *Proper Purpose*

If the proffered "evidence only goes to show character, or that the defendant had a propensity to commit the crime, it must be excluded. Where, however, the evidence also tends to prove some fact besides character, admissibility depends upon whether its probative value outweighs its prejudicial effect." *Id.* at 887 (citing *Gov't of V.I. v. Harris*, 938 F.2d 401, 419 (3d Cir.1991)). If the government offers evidence of other wrongful acts, "it must clearly articulate how that evidence fits into a chain of logical inferences, no link of which can be the inference that because the defendant committed ... [such an act] before, he therefore is more likely to have committed this one." *Id.* Nevertheless, Rule 404(b) "is inclusive, not exclusive, and emphasizes admissibility." *Id.* at 886 (citation omitted).

The government presents several arguments as to why Lee's statements are admissible under Rule 404(b). First, it says that Lee's statements are "relevant [to] and admissible regarding

---

[18]At least it is undisputed insofar as Lee's statements reflected his motives. *See infra* n.22 and accompanying text.

the key issue[] of knowledge." (Appellee's Ans. Br. at 45.) Lee's trial, however, was not about whether he knew that he had a rifle in the back seat of his Jeep. There was no question of accident or mistake. Rather, Lee's defense was simply that there was no rifle in his Jeep and that the rifle recovered at the Apartments was not his. Thus, the trial was about weighing Kraus's credibility against Lee's, and, as Lee rightly notes, "[i]t is inconceivable that if the jury believed [Kraus's] testimony it would have found that Lee acted by mistake." (Appellant's Op. Br. at 47.)

The government presses the point, however, saying that knowledge is at issue because Lee did not admit possession of any firearm. It relies on our decision in *United States v. Givan*, 320 F.3d 452 (3d Cir. 2003), in which the defendant was convicted of conspiring to distribute and possess with intent to distribute heroin. *Id.* at 455. There, we allowed the government to introduce into evidence the fact that the defendant had a prior felony drug conviction. We accepted the government's argument that,

> because it had to prove that Givan knew, prior to its discovery by the troopers, that a quantity of heroin was hidden in the back seat of the rental car and that it had to prove that Givan possessed the heroin with intent to distribute it, knowledge and intent were material and contested issues at trial.

*Id.* at 460-61. Unlike in *Givan*, however, where the defendant denied knowing that there was heroin in the backseat of his rental car and that he intended to distribute it, Lee has not put knowledge at issue. Lee is not arguing that he did not know there was a rifle in his back seat. His argument is a straightforward denial that any gun was there.

The government also argues that Lee put his knowledge at issue when his counsel told the jury, "Yes, the police did find the rifle in the woods near where Mr. Lee abandoned his Jeep, but the evidence will show that he did not put it there." (App.

at 334.) But the government's argument fails again. The quoted comment does not amount to a statement that Lee did not know the rifle was in his possession or near his vicinity; it was once more an out-and-out denial that he had anything to do with the gun.

The government does far better with motive as a theory of admissibility. According to the government, the statements Lee made to Kraus reveal Lee's motive for possessing firearms because he admitted that he has no qualms about using such weapons against anyone who threatens him or his family, and he stated that he was in a violent feud with Ernest "Pickles" Harris. *See* App. at 216 ("The defendant's statements regarding his motive for possessing firearms (to use them against anyone who would threaten Mr. Lee or his family, such as ... 'Pickles', with whom he and his family have had a long standing feud) is certainly relevant to his motive to possess a firearm in this matter."). We agree with that assessment of the statements. Not only did Lee claim that, at some point in the past, Harris had planned to shoot him and he had shot at Harris, he also admitted that the feud he and his family had with Harris was ongoing. Moreover, Lee conceded that he "has access to a lot of guns and would use them against anyone who threatens him or his family." (*Id.* at 417.) Those statements reveal that Lee had reason to possess a weapon on the day in question.[19]

_____

[19]The Dissent questions whether motive is "relevant in a case such as this ... [because] we are not faced with a situation where answering 'why' would help solve the crime ... ." (Dissent at p. 7-8.) Motive is one of the permissible purposes listed in Rule 404(b) not because the "why" helps solve a crime, but because it is highly relevant to show that a defendant had a motivation to commit the crime for which he is being charged. In a case like this, where Lee is asserting that he never had a gun on the day in question, it is important to know that he had a personal motivation to possess a gun. Indeed, someone who is involved in an ongoing feud – a feud during which guns have been used – is far more likely to have a gun in his possession than someone who is not involved in such a feud. *See United States v. Cassell*, 292 F.3d 788, 793 (D.C. Cir. 2002) ("[I]n cases

where a defendant is charged with unlawful possession of something, evidence that he possessed the same or similar things at other times is often quite relevant to his knowledge and intent with regard to the crime charged. ... [A] jury could infer possession from motive, which could in turn be inferred from intent.") (quotations omitted).

The Dissent also points out that the District Court did not cite to motive in its initial ruling on the admissibility of the statements. (Dissent at pp. 8-9.) However, the District Court did instruct the jury that it could "consider the evidence ... for the purpose of deciding whether the defendant had the ... motive ... to commit the crime charged ... ." (App. at 596.) That decision to instruct on motive is not without meaning. By offering motive as a basis on which the jury could consider the evidence, the District Court necessarily concluded that motive was a proper basis for admission of one or more of the statements.

Further, the Dissent's reliance on *Sampson*, in which we held that "[t]he district court, if it admits the evidence, must in the first instance, rather than the appellate court in retrospect, articulate the reasons why the evidence goes to show something other than character[,]" 980 F.2d 888, does not account for language that follows immediately after that quote. We went on to say that, "*Unless the reason is apparent from the record*, a mere list of the purposes found in Rule 404(b) is insufficient." *Id.* (emphasis added). Motive, in this instance, is apparent from the record, and is an entirely legitimate basis upon which the jury could consider statements about Lee's reason for having a rifle, despite his denials. Lee's statements to Kraus reveal that he was afraid of being attacked by a specific person – who had attempted to kill him in the past – and that he would arm himself for his and his family's protection.

In sum, Lee had a compelling reason to arm himself, and that is directly relevant to the question of whether Lee had a rifle in his car.

34

We note that the final part of Lee's statements to Kraus – in which Lee admitted that he had possessed firearms on a prior occasion in 2000 or 2001 when Kraus stopped him – does not, in isolation, speak to motive in the same way as Lee's statements about possessing guns to protect his family and about his ongoing feud with Harris's family. Based on the record, we cannot tell whether, as a factual matter, the statement about 2000 or 2001 was part and parcel of Lee's first two statements about protecting his family and his violent feud with Harris. Moreover, it is not clear to us whether, as a procedural matter, defense counsel, in argument before the District Court, treated Lee's statements as one single conversation, or whether defense counsel treated the statements as analytically distinct. While defense counsel did parse the statements in a motion in limine submitted to the District Court, in the briefing before us, no

distinction was drawn between the various admissions.[20] (*See* App. at 180.)

Assuming that this last statement can, as a factual matter, be separated from Lee's first two statements, and assuming further that this last statement was argued separately to the District Court and so can be analyzed separately here, it was error to admit the third statement regarding Lee's 2000 or 2001 gun possession because that statement is not probative of motive (or any other permissible ground listed in 404(b)). Unlike the statements concerning the ongoing feud and his desire and capability to protect himself and his family with guns, his comment that he once had a gun years earlier does not, on its

---

[20]The Dissent slices the statement more finely than did the defendant in his motion in limine. Our dissenting colleague analyzes Lee's statement to Kraus by dividing it into six separate statements (Dissent at pp. 1-4), while Lee had divided it into three, leaving out certain elements of the statement altogether (*see* App. at 180). As an initial matter, the Dissent separates the statement, "[Lee] shot at an individual named Pickles" from "[Pickes] was actually on his way with that gun to kill [Lee] ... [and] there's a long time, ongoing violent feud between Mr. Lee's family and Pickles." (*Id.*) The Dissent faults us for not separating those two statements. (*See* Dissent p. 4 n.2.) However, Lee never separated that description of the feud into two separate statements, and rightly so because those statements, as Kraus recounted them, can appropriately be viewed as a single statement about the feud. That Lee shot at Pickles also shows the degree to which the feud between them was real and violent, and not just a matter of heated words. It thus shows the high degree of Lee's motivation to possess a gun.

Moreover, at trial, Lee argued only that the entire interview with Kraus should be excluded, not that it should be parsed into six separate statements to be analyzed individually. The defense argument was simply to keep it all out. We should be wary of holding district courts to an analytical construct that was not fairly presented at trial.

own, prove anything about a present motive to be armed. However, any error in admitting that third statement was harmless in the context of the overall admissions, because it was "highly probable" that the admission of Lee's final statement did not contribute to the conviction, especially considering the fact that the jury had just heard the previous two statements that spoke so directly to Lee's motive.[21] *See United States v. Ali*, 493 F.3d 387, 392 (3d Cir. 2007) ("[T]he test for harmless error is whether it is highly probable that evidentiary error did not contribute to conviction." (citing *Gov't of V.I. v. Toto*, 529 F.2d 278, 283-84 (3d Cir.1976))); 2A FEDERAL PROCEDURE, LAWYER'S EDITION § 3:8444 (1981) ("[F]ederal appellate courts are more willing to find harmless error in the area of evidentiary rulings than they are in other areas of procedure." (citing *Julander v. Ford Motor Co.*, 488 F.2d 839, 843 (10th Cir. 1973))).[22]

---

[21]In discussing harmless error, our dissenting colleague suggests that the rest of the evidence of Lee's guilt was not "overwhelming," citing to, for example, Digger's equivocal actions near the rifle and the lack of forensic evidence. (Dissent at pp. 19-20.) However, the Dissent is not recognizing that 1) Lee fled from the original stop; 2) a coat matching what Kraus said he saw covering a long object in the backseat of Lee's Jeep was found with the rifle near the Jeep; 3) Lee admitted that he had abandoned the Jeep near where the rifle was found; and 4) Lee continued to be a fugitive until he was found hiding in a couch. These are not minor facts. They are, particularly in combination, powerful evidence of guilt, even without the 404(b) statements.

[22]The government also contends that Lee's statements are admissible evidence of his modus operandi. The prosecution's theory is as follows: Lee admitted to fleeing from a traffic stop conducted by Kraus four years earlier because he had a weapon in his vehicle. That prior act shows Lee's method of flight to avoid conviction for weapons possession. We have held that "[a] jury can rationally infer from evidence that the defendant committed a prior crime in an unusual and distinctive manner and evidence that a second similar crime was committed in the

In conclusion, the government presented a "chain of logical inferences" between Lee's prior weapons possession and the rifle charge that does not suggest a mere propensity to engage in weapons offenses. *Sampson*, 980 F.2d at 887. Lee's statements about possessing guns to protect his family and about his ongoing and violent feud with Harris's family are relevant to show his motive for possessing a rifle on the day in question. Thus, the evidence was offered for a proper purpose under Rule 404(b).

ii. *Probative Value vs. Prejudicial Effect*

Given the relevance of Lee's statements,[23] we next determine under *Huddleston* whether, pursuant to Rule 403, the danger of unfair prejudice substantially outweighs the probative value of the statements. 485 U.S. at 691. Given the substantial deference owed to district courts in weighing evidence under Rule 403, combined with the highly probative value of the evidence – particularly Lee's statements about his feud with Harris and what that revealed about Lee's motive – the District Court's decision to admit those statements was not "arbitrary or irrational." *See Univ. Rehab. Servs.*, 205 F.3d at 669 ("[We] cannot reverse a District Court's conclusion under Federal Rule 403 unless such a conclusion is ... 'arbitrary or irrational.'" (citation omitted)). Indeed, the statements reveal Lee's motive to possess weapons on the day in question, which is highly

___

same unusual and distinctive manner that the defendant committed the second crime." *Givan*, 320 F.3d at 467-68. But there was nothing unusual or distinctive about Lee driving away from the police back in 2000 or 2001. As Lee notes, "[t]he act of fleeing from a traffic stop to avoid being found with contraband is hardly so unique as to create an inference that Lee had a rifle in his Jeep here because he had a gun in his vehicle [before] ... ." (Appellant's Op. Br. at 51.)

[23]*See supra* n. 18 and accompanying text.

probative in a case like this, in which the defendant has denied possession all together.[24]

### iii. *Limiting Instructions*

Lastly, *Huddleston* requires us to ensure that the District Court charged the jury to consider the evidence only for the limited purpose for which it was admitted. 485 U.S. at 691-92. The District Court gave a limiting instruction as follows:

> Now, you have heard evidence that the defendant ... made certain statements to Lieutenant Kraus about his past possession and use of firearms when he was arrested on July 12, 2005. This evidence was admitted for a limited purpose only. You may consider this evidence only for the purpose of deciding whether the defendant had the state of mind, knowledge, motive or intent necessary to commit the crime charged in the indictment, or did not commit the acts for which he is on trial by accident or mistake. Do not consider the evidence for any other purpose.

---

[24]Our dissenting colleague asserts that we "never address[] the issue of prejudice" (Dissent at p. 15), but we have endeavored to do so here. To reiterate, it was not an abuse of discretion to conclude that the danger of unfair prejudice – i.e., that the jury would wrongly use Lee's admission of prior gun possession and use to conclude that he must have been guilty of the crimes charged here – did not substantially outweigh the relevance of the statements Lee made to Kraus. Application of the standard dictated by Rule 403 is, by definition, a judgment call. That the District Court could usefully have made that judgment call with a more explicit description of its "probative value vs. prejudicial effect" weighing of the evidence does not lead us to conclude that the experienced trial judge failed to apprehend the nature of the prejudice and the probative values at stake.

Of course, it is for you to determine whether you believe this evidence, and if you do believe it, whether you accept it for the purpose offered. You may give it as much weight as you feel it deserved, but only for the limited purpose that I described to you.

The defendant is not on trial for committing these other acts. You may not consider the evidence of these other acts as a substitute for proof that the defendant committed the crime charged. You may not consider this evidence as proof that the defendant has a bad character or any propensity to commit crimes. Specifically, you may not use this evidence to conclude that because the defendant may have committed the other acts, he must also have committed the act charged in the indictment.

Remember, the defendant is on trial here only for possessing a firearm on the date in question, not for these other acts. Do not return a guilty verdict unless the government proves the crime charged in the indictment beyond a reasonable doubt.

(App. at 595-97 (quoting THIRD CIRCUIT MODEL JURY INSTRUCTIONS - CRIMINAL § 4.29 (2009).) At the conclusion of the District Court's instructions to the jury, defense counsel asked the Court to repeat the limiting instruction, which it did.

Now, for the first time, Lee challenges the adequacy of that instruction. Because he did not object at trial, any review of the instruction must be for plain error. *See United States v. Olano*, 507 U.S. 725, 734-36 (1993); *see also United States v. Pelullo*, 399 F.3d 197, 221 (3d Cir. 2005) ("A party generally may not assign error to a jury instruction if he fails to object before the jury retires or to 'stat[e] distinctly the matter to which that party objects and the grounds of the objection.'" (quoting *Jones v. United States*, 527 U.S. 373, 387 (1999))).

Lee has not shown any error in this regard, much less plain error. Though Lee argues that the District Court's

40

instruction provided no guidance because it simply repeated the litany of permissible theories under Rule 404(b), the Court in fact did more than simply list the 404(b) grounds. The instruction properly informed the jury of the limited purpose for considering Lee's admissions about gun possession.[25] To the extent that Lee is now arguing that the jury could not have understood the instruction, we have rejected such sweeping and non-specific assertions before. *See Givan*, 320 F.3d at 462 ("[I]t is a basic tenet ... that a jury is presumed to have followed the instructions the court gave it ... [and i]f we preclude the use of evidence admissible under Rule 404(b) because of a concern that jurors will not be able to follow the court's instructions regarding its use we will inevitably severely limit the scope of evidence permitted by that important rule."). Lee's statements about possessing guns to protect his family and about his feud with Harris therefore meet the guidelines for

---

[25]The implication from the Dissent is that the District Court's limiting instruction – which followed nearly word-for-word our Circuit's model 404(b) instruction – is inherently inadequate. (*See* Dissent at p. 13-14.) We disagree. The list of proper evidentiary purposes set forth in 404(b) and repeated in the model instruction, which is the list that the District Court used here, is not made improper solely because the Court was not as clear as it could have been in articulating why motive was a proper purpose that the jury could rely on when considering Lee's statements to Kraus. We take this opportunity to encourage district court judges to delineate the specific grounds for admissibility of 404(b) evidence, even if the entire 404(b) litany has already been recounted. Our dissenting colleague is quite right to note that comments to the model jury instructions encourage that practice. (Dissent at p. 13-14 n.8.) However, the government argued motive; motive is apparent on the record; and the District Court instructed on motive. Given the very deferential standard we are under, the instruction was adequate. To hold otherwise would be contrary to one of the overarching principles we referred to in *Sampson*, namely that "[Rule 404(b)] is inclusive, not exclusive, and emphasizes admissibility." 980 F.2d at 886.

admissibility articulated in *Huddleston*. They were admissible for a proper purpose under Rule 404(b) as evidence of Lee's motive for possessing a weapon; they are undisputedly relevant under Rule 402; the District Court's finding under Rule 403 that the danger of unfair prejudicial effect did not substantially outweigh the probative value of the statements was not arbitrary and irrational; and the District Court twice charged the jury to consider the evidence only for the limited purpose for which it is admitted.[26] *See Huddleston*, 485 U.S. at 691-92.

### D.     *The Prosecutor's Statements Regarding Digger*

Lee next argues that he is entitled to a new trial based on two instances of prosecutorial misconduct. First, he contends that, during the government's closing, the prosecutor improperly referred to evidence regarding the bloodhound, Digger, that had been excluded by the District Court. Second, he asserts that the prosecutor vouched for the credibility of Digger based on his own personal experience with hunting dogs. That misconduct, says Lee, deprived him of due process and a fair trial.

### i.     *Background*

In a pre-trial motion, Lee sought to exclude the evidence of Digger's behavior as irrelevant, or, if relevant, inadmissible

---

[26]The Dissent suggests that Lee's statements are also problematic because they were recounted by Kraus, rather than by Lee himself. (*See* Dissent pp. 14-15 n. 20.) But virtually every confession entered into evidence at a criminal trial is made to someone else and not on the stand by the defendant, and very often the confessions are made to police officers. We do not presume a reliability problem in all such cases. Here, Lee frankly confessed to Kraus his motive for and willingness to carry a firearm. Further, the defense theory of the case has not been that Lee never said to Kraus what Kraus claims Lee said. The dispute instead has consistently been about whether the statements should be allowed into evidence, not whether they were made.

under Rule 403. Specifically, Lee argued that the evidence would make the jury believe that Digger "actually identified the gun and the jacket when, in fact, that's not what happened." (App. at 226.) Lee also attacked the probative value of the evidence, arguing that the officers searching the area had contaminated the Jeep and the scene so that the dog could not have reliably tracked a scent.

The Court held that the evidence of Digger's tracking was admissible, "as it tends to prove that [Lee], who had occupied the front seat of the Jeep, had traveled along the pathway where the coat and rifle were found and then on to the apartment complex. This is circumstantial evidence that [Lee] possessed and removed the coat and rifle from the Jeep." (*Id.* at 2.) The Court added, however, that "the Government has agreed to eliminate any reference in the testimony that Digger paused at the coat and rifle, thus, further reducing any unfair prejudice to [Lee]."[27] (*Id.*)

In light of the Court's pre-trial ruling, police officer Harkins, the dog handler, did not mention in his testimony that Digger "paused" at the coat and the rifle. Rather, he said that Digger went from the Jeep, "down a flight of steps, through a very overgrown weeded asphalt parking lot ... slightly to the left angle of the fence." (*Id.* at 458.) He added that Digger "went down the fence line approximately 20, 25 feet" (*id.*), and that he came within "10 to 15 inches" of the rifle and the coat. (*Id.* at 460.)

Lee argues that, unlike Harkins, the prosecutor disregarded the Court's instructions and argued exactly what the Court had excluded, namely, that Digger paused at the coat and rifle. The prosecutor said the following:

> [W]hat Digger told us from Chief Harkins on the stand is that the person who was the driver of that

---

[27]The Court's meaning was plainly that the risk of unfair prejudice was reduced.

car went straight down the steps, straight across the parking lot, deposited a gun, went through the fence ... and then ultimately escaped.

. . .

What happened with Digger is that Digger came from the car, went down the steps, across the parking lot and to the gun. Digger did not go to the right where the first person to find this firearm went originally, Digger went in that exact path. Does this support Lieutenant Kraus or does it contradict him?

(*Id.* at 617; 619.) Lee did not object when those statements were made, but argues on appeal that in making those statements, the prosecutor was suggesting that Digger paused at the rifle, which was forbidden by the Court's earlier ruling. Lee contends that "it is [] improper for a prosecutor, during closing arguments, to bring to the attention to the jury any purported facts that are not in evidence and are prejudicial." (Appellant's Op. Br. at 59 (citation omitted).)

The second instance of alleged misconduct is what Lee calls the prosecutor's impermissible vouching for Digger, by "assuring the jury of Digger's credibility based on [the prosecutor's] ... own personal experience hunting and tracking using dogs." (*Id.*) The specific statements Lee points to are as follows:

I am a hunter. Some of you may be as well. As a hunter, I've had experience with dogs in the past. I've hunted with bird dogs and I've hunted with beagles for the majority of my life. It never ceased to amaze me when we were out with those dogs, their abilities.

When I rabbit hunt with my brothers and my father, we would sometimes see a rabbit, we would jump a rabbit and it would be running out front. Our dog, being much smaller than us, he

44

couldn't necessarily see the rabbit, so we had a signal that we would tell the dog where we saw and what we saw. We would say, here's the bunny. That meant to the dog, we saw the rabbit, here's where we think it was. And the dog would come there and start to circle and from just going to that location, smelling in one direction and then smelling in the other, that dog could tell which one of those two tracks was fresher and go in the direction that the rabbit went to rather than where the rabbit came from. That never ceased to amaze me.

Or, when you hunted with bird dogs, that that bird dog would stop a foot and a half from this particular bird, a pheasant—

(App. at 615-16.) At that point, Lee's counsel objected, noting the "personal nature of the testimony which doesn't have anything to do with the evidence." (*Id.*) The District Court sustained defense counsel's objection, stating that "we should move from that." (*Id.*) The prosecutor complied and did not return to his reminiscing.

ii. *Standard of Review: Prosecutorial Misconduct*

We review for abuse of discretion a district court's ruling on a contemporaneous objection. *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003). However, any non-contemporaneous objections are reviewed for plain error. *Id.* While Lee objected to one portion of the prosecutor's closing argument – the portion that Lee now claims was vouching – he did not object to the part of the closing involving Digger's behavior near the rifle. It is only here on appeal that he asserts that the prosecutor committed misconduct by suggesting

that Digger paused at the coat and rifle.[28]  Thus, we review the ruling on alleged vouching for abuse of discretion, and we review the prosecutor's description of Digger's behavior near the rifle for plain error.

A prosecutor's comments can create reversible error if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985).  Moreover, we "must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001).  "A finding of prosecutorial misconduct requires reversal unless the error is harmless." *Brennan*, 326 F.3d at 182.  "If the error is constitutional, we will affirm [only] if we determine that the error is harmless beyond a reasonable doubt." *United States v. Helbling*, 209 F.3d 226, 241 (3d Cir. 2000).  "If the error is non-constitutional, we will affirm when it is highly probable that the error did not contribute to the judgment." *Id.* (quotation omitted).

---

[28]Lee tries to argue that he preserved the issue by objecting to the prosecutor's proposed use of this evidence during a suppression hearing, reminding the Court of its ruling excluding the evidence, and noting in his own closing argument that the prosecutor's interpretation of the bloodhound evidence was incorrect.  However, those are not objections raising the specific contention that the prosecutor had alluded to excluded evidence.  In fact, there was no objection to the specific statements which Lee now argues contained excluded evidence.

### iii. *The Prosecutor's Alleged Reliance on Excluded Evidence*

Though silent on the issue before, Lee now contends that the prosecutor committed misconduct by alluding to excluded evidence in suggesting that Digger "paused" at the coat and rifle. (App. at 2.) Lee's previous silence is understandable, since the record does not actually support his argument. At no time did the prosecutor state that Digger paused or hesitated at the coat and the rifle. While the prosecutor did state that "Digger came from the car, went down the stairs, across the parking lot and to the gun" (*Id.* at 619), and while that comment arguably comes close to what was prohibited by the District Court, there was no assertion that the dog paused or alerted at the gun. Instead, a fair interpretation of the prosecutor's argument is that Digger led the police away from the car, down a path, and to the area where the coat and rifle were located, before heading to the Apartments. Given Harkins's testimony that Digger traced a path from Lee's car to within inches of where the police discovered the coat and rifle, the District Court's allowing the prosecutor's argument was not plain error. We have repeatedly held that a "prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991) (citation omitted). That latitude encompasses the argument that the path that Digger tracked was evidence that Lee had dropped the coat and rifle by the fence.

### iv. *The "Vouching" Argument*

A prosecutor may not vouch for the credibility of a witness based on the prosecutor's personal knowledge, experience, or opinions. *See Young*, 470 U.S. at 18-19. Vouching occurs when two criteria are met: "(1) the prosecutor must assure the jury that testimony of a Government witness is credible; and (2) this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record." *United States v. Walker*, 155 F.3d 180, 187 (3d Cir. 1998). While Lee says that the prosecutor vouched

for the bloodhound evidence, the government argues that there was no vouching because the prosecutor "merely told an anecdote about his own experience with Beagles and bird dogs." (Appellee's Ans. Br. at 64.) The government then argues that it is "common knowledge that dogs have an ability much greater than humans to detect scent." (*Id.* at 65 (quotation omitted).)

Whether something is "common knowledge" to a group of people largely depends, of course, on the composition of the group. The amazing abilities of hunting dogs are not the common ken of all humanity. Perhaps the heightened ability of dogs to detect scent is well-known, but the prosecutor did not confine himself to that. Rather, he spoke from his own personal experience with dogs, dating back to his childhood, and reflected on the remarkable things he had witnessed. As a result, the jury may have been influenced by the prosecutor's experiences, thinking that the prosecutor's views bolstered the credibility of Kraus's and Harkins's testimony about Digger.[29] This is what the rule against vouching prohibits.

---

[29]The government argues that it "is unclear whether or not a prosecutor could be guilty for vouching for a police dog, who was not actually a witness in the matter." (Appellee's Ans. Br. at 64.) To the extent that Lee is complaining not just about the prosecutor's vouching for Kraus's and Harkins's testimony about Digger but is also saying that the prosecutor was vouching directly for Digger, an interesting question is raised. Assuming the latter problem were the only one at issue and we were not presented with a classic case of vouching for the credibility of a testifying witness, it would still be a close cousin of classic vouching. If the prosecutor was vouching for the reliability of Digger as an expert on tracking scent, using personal anecdotes to vouch for Digger's expertise, that would be impermissible because "[i]t is well settled that a prosecutor in a criminal case has a special obligation to avoid improper suggestions, insinuations, and especially assertions of personal knowledge[,]" *United States v. Edwards*, 154 F.3d 915, 921 (9th Cir. 1998) (internal quotations omitted), which the I-know-dogs commentary was here.

48

However, even though the prosecutor did cross the line into improper vouching, a new trial is not warranted because it is highly probable that the error did not contribute to Lee's conviction, for several reasons.[30] *Helbling*, 209 F.3d at 241. First and most significantly, the prosecutor did not continue the vouching once an objection was raised and the District Court directed the prosecutor to move on.[31] *See United States v. Galloway*, 316 F.3d 624, 633 (6th Cir. 2003) (holding that, while prosecutor's statement concerning his personal opinion were improper, the statement did not warrant a reversal because the defendant objected at trial and the court sustained the objection and directed the prosecutor to move on). Second, the acuteness of Digger's sense of smell was of record through Harkins's testimony. Third, the testimony about Digger's behavior required no vouching. The dog went within inches of the rifle on its way to the Apartments. That concrete and specific evidence, not general praise for the nose on man's best friend, is what in all likelihood left an impression on the jury, if anything about Digger did. Fourth, the Court specifically instructed the jury that "what the lawyers said is not evidence and it's not binding on you." (App. at 589.)

Thus, despite the wholly unnecessary vouching for the testimony about Digger and the gratuitous comments about a dog's ability to track a scent, a new trial is not warranted because it is highly probable that the misconduct did not contribute to the judgment.

---

[30] While Lee describes vouching as a constitutional error, we have held that "vouching that is aimed at the witness's credibility and is based on extra-record evidence is deemed non-constitutional error." *United States v. Dispoz-O-Plastics, Inc.*, 172 F.3d 275, 286 (3d Cir. 1999) (citing *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995)).

[31] Lee notes that the District Court did not give any curative instruction after it sustained his objection. However, defense counsel never requested one, and the prosecutor moved on immediately after the Court sustained the objection.

E.      *Reckless Endangerment as a Crime of Violence*

Lee challenges his sentence, arguing that the District Court erred in classifying his misdemeanor conviction for reckless endangerment as a "crime of violence," thereby increasing his offense level under the career offender enhancement found in § 2K2.1(a)(2) and (a)(4) of the Sentencing Guidelines.[32]  The government had argued to the District Court that Lee's conviction was a crime of violence under the Guidelines but, on appeal, concedes that "reckless conduct, standing alone, is not the type of purposeful conduct that can constitute a crime of violence ... [and thus, Lee's] sentence should be vacated and the case remanded for the purposes of re-sentencing." (Appellee's Ans. Br. at 68 (citation omitted).)

Lee and the government are correct in their agreement about the law.  Following Lee's sentencing hearing, the Supreme Court decided *Begay v. United States*, 553 U.S. 137 (2008), in which it effectively held that, to qualify as a crime of violence, the crime at issue must present "a serious potential risk of physical injury" and be one that "typically involves purposeful, violent, and aggressive conduct."[33]  *Id.* at 144-45. The Court expressly distinguished crimes involving negligence or recklessness from those involving violence or aggression. *Id.* at 146; *see also United States v. Johnson*, 587 F.3d 203, 208 (3d

---

[32]The District Court employed the 2007 edition of the Guidelines Manual, effective November 1, 2007.

[33]While the *Begay* Court addressed the definition of "violent felony" under the Armed Career Criminal Act ("ACCA"), we have since held that the definition of "violent felony" in the ACCA and the definition of a "crime of violence" in the Sentencing Guidelines are "close enough that precedent under the former must be considered in dealing with the latter." *United States v. Polk*, 577 F.3d 515, 519 n.1 (3d Cir. 2009) (citations omitted).

Cir. 2009). Thus, following *Begay*, a conviction for mere recklessness cannot constitute a crime of violence.[34]

Lee's earlier-noted conviction for concededly reckless conduct, standing alone, does not qualify as a crime of violence. Accordingly, as the parties agree, Lee's sentence must be vacated and the case remanded for re-sentencing.

F. *The Constitutionality of the Felon-In-Possession Statute*

Finally, Lee argues that the felon-in-possession statute is unconstitutional. He recognizes, however, that we are bound by our decision in *United States v. Singletary*, 268 F.3d 196, 198-205 (3d Cir. 2001), in which we confirmed the constitutionality of the felon-in-possession statute, and he acknowledges that he presents this issue only "to preserve a challenge to the constitutionality of [the felon-in-possession statute] for Supreme Court review." (Appellant's Op. Br. at 80.) We therefore reject that argument without further discussion.

---

[34]Other circuits addressing the issue have similarly held that, after *Begay*, reckless conduct does not qualify as a crime of violence. *Johnson*, 587 F.3d at 211 n. 8. *See, e.g., United States v. Baker*, 559 F.3d 443, 453 (6th Cir. 2009) (holding that Tennessee's reckless endangerment statute does not qualify as a crime of violence); *United States v. Smith*, 544 F.3d 781, 786-87 (7th Cir. 2008) (finding that Indiana's criminal recklessness statute is not a crime of violence); *United States v. Gray*, 535 F.3d 128, 131-32 (2d Cir. 2008) (holding that New York's reckless endangerment statute is not a crime of violence).

Pennsylvania's reckless endangerment statute, under which Lee was convicted, states that "[a] person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 PA. CONS. STAT. § 2705.

**III.    Conclusion**

For the reasons discussed above, we will affirm Lee's conviction but will vacate his sentence and remand for re-sentencing.

RENDELL, Circuit Judge, dissenting.

I respectfully dissent because I conclude that the District Court should not have admitted Officer Kraus's testimony concerning Lee's post-arrest statements regarding Lee's prior experiences with guns, violent feuds, and past experiences with Officer Kraus, and that this error was not harmless. I acknowledge that this is a close case and that our standard is deferential, but I submit that when it comes to guns, we must be careful, for the prejudicial impact on the jury of this type of character evidence is very real indeed.

The majority opinion refers to salient portions of Kraus's testimony but it is worth including it in its totality. I number distinct points for ease of reference. Kraus testified that, in a post-arrest interview:[1]

> 1. Lee insisted he does not typically own or carry guns. However, he did state that he has access to a lot of guns and

---

[1] Although the District Court and the majority opinion refer to, respectively, "Defendant's statements made by him at the time of his arrest," App. 5, and "Lee's Statements Regarding His Prior Possession of Firearms," Majority Op. 29, the evidence in question is actually *Officer Kraus's testimony* regarding his report of statements Lee purportedly made to him post-arrest. These were not transcribed statements, nor were they statements in Lee's own words, and the report was not made part of the record as far as I can tell.

2. would use them against anyone who threatens him or his family.

3. He stated that he shot at an individual named Pickles, who was well known as Ernest Harris, on multiple occasions.

4. He went on to say that I arrested Pickles, which is true, in the past, with a firearm. And Mr. Lee claimed that on that night, that Ernest Harris, Pickles was arrested, that Pickles was actually on his way with that gun to kill Mr. Lee. He acknowledged that and said that there's a long time, ongoing violent feud between Mr. Lee's family and Pickles. . . .

5. Lee continued to insist that he did not have any weapons in the car when I stopped him on June 27th, but he did compare that to a time when he stated that he fled from me before in the Hill District. He asked me if I remembered the time that I chased him and lost the car that started on Morgan Street in the

2

hill. As I was remembered, he stated that I pulled behind him, I had my — at that time in a marked police car, when I was in uniform in patrol in the Hill District, I guess I was behind him, according to him, and I had my white illumination lights, which are like spotlights contained on the light bar of the car which we can access, and when he saw those lights, he claimed that he thought I was preparing to pull him over. So he stopped, motioned me alongside of him to ask for directions to Chauncey Street. I did remember that. He went on to say that he had — I had gotten out of the car because I had smelled marijuana and as I approached, the car he took off. And I do remember this. It would have been probably back in 2001 or 2002. I didn't know at the time it was Mr. Lee. There was no connection at that point, but I did remember that.

6. He further told me that if I would have caught him that night, I would have caught him with guns in the car, but, again, he continued to insist that he had no guns in the car

3

on June 27th when I stopped him.

App. 417-18. The majority concludes that the initial references to the facts that Lee had access to guns and would use them to protect his family (statements 1 and 2), and that he had an ongoing violent feud with Ernest "Pickles" Harris (statement 4), were admissible as probative of Lee's "motive,"[2] and that this outweighed the prejudice caused by the reference to his prior gun possession. It reasons that the rest of the passage (statements 5 and 6) should not have been admitted but that its admission does not require a new trial because it was "highly probable" that the offending statements did not contribute to the verdict. I respectfully disagree.

As a trial court judge, I was always concerned about references to past possession or use of guns in gun cases, and references to past possession or use of drugs in drug cases. While often admissible as going to a proper purpose under Rule

---

[2] The majority does not explicitly discuss the admission of statement 3, the statement that Lee "shot at an individual named Pickles, who was well known as Ernest Harris, on multiple occasions," instead folding this statement into its analysis regarding the "violent feud" between Lee and Harris. Majority Op. 30. This is significant, given that perhaps the most grave prior bad act evidence introduced is that Lee supposedly stated that he had shot at Harris. It is not clear how the fact that Lee shot at Harris 'adds' anything relevant to Lee's motive for possessing a gun, once it is established that Lee and Harris are engaged in an ongoing violent feud.

4

404(b), from an evidentiary standpoint, this type of evidence makes the jury's job (i.e. to avoid using this type of evidence as branding the defendant as a gun or drug criminal) very difficult, as a practical matter.

While the potential impact of this type of evidence can nonetheless be contained by specific instructions to the jury, the prejudice resulting from evidence of guns and drugs is immense. As the Advisory Committee's Note to Rule 404(a) indicates, this type of character evidence epitomizes what "prejudice" is all about:

> Character evidence is of slight probative value and may be very prejudicial. It tends to distract the trier of fact from the main question of what actually happened on the particular occasion. It subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened.

Fed. R. Evid. 404(a) Advisory Committee's Note. I submit that the potential for such "distraction" is especially great in gun and drug cases.

Prior bad act evidence is governed by Rule 404(b), which, as the majority notes, involves a four-step test requiring

courts to assess proper purpose and relevance, to weigh prejudice against probative value under Rule 403, and to offer an appropriate limiting charge to the jury. *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988). The Advisory Committee Notes to Rule 404(b) state that, while evidence of other wrongs or acts is "not admissible to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it," such evidence "may be offered for another purpose, such as proof of motive, opportunity, and so on, which does not fall within the prohibition." None of the statements here were admitted for a proper purpose.

First of all, the part of the statement that the majority has held is probative of motive, regarding Lee's willingness to use guns to protect his family and the ongoing feud in which he is engaged, is only a small part of what the jury heard. As noted above, the jury also heard Officer Kraus testify that Lee told him that he had access to "a lot of guns," that he has shot at Ernest "Pickles" Harris "on multiple occasions," that he has previously fled from Officer Kraus because Officer Kraus smelled marijuana coming from his car, and that he did have guns in his car during this previous encounter with Officer Kraus. None of these other, very colorful, statements—which I have labeled 1, 3, 5, and 6—go to Lee's motive for possessing guns in general, let alone to his motive for possessing a rifle on this particular occasion. The majority rightly criticizes the "proper purpose" theories offered by the Government other than motive (knowledge, intent, absence of mistake, modus operandi), recognizing that the only statements that may have been properly admitted are those that could be relevant to motive. The other statements from Officer Kraus's testimony have no

6

probative value and fail the 'relevance' test of *Huddleston* entirely. They should have been excised from what the jury heard.[3]

The other two portions of Officer Kraus's testimony, referencing the facts that Lee would use guns to protect his family and that he is in an ongoing violent feud with Ernest "Pickles" Harris, present closer calls. The majority found these statements admissible as probative of Lee's "motive." I am less sure.

First, it is questionable that "motive" is relevant in a case such as this. Lee did not contend that he had no reason to possess a gun, and we are not faced with a situation where answering "why" would help solve the crime of possession. There is no suggestion in the record that Lee was on his way to a confrontation with Ernest "Pickles" Harris, or to protect his family, or to do anything else with a gun at that particular moment. If relevant at all, Lee's family feud is not of great probative value with respect to the question of whether he in

---

[3] The majority takes me to task for parsing the statements in a way the defense did not, Majority Op. n.20, since the defense urged total exclusion. But I urge total exclusion as well. And the statements are parsed only for ease of reference and in order to follow the majority's analysis which distinguishes among them.

fact was in possession of a gun on this particular occasion.[4]

Second, and perhaps most importantly, the District Court did not rule that these statements were admissible as relevant to motive. Instead, the District Court ruled that the statements were "admissible to prove intent, knowledge and/or the absence of mistake."[5] App. 5. The majority quite properly rejects the "knowledge" theory of admissibility, but concludes that the "government does far better with motive as a theory of admissibility," Majority Op. 33, in effect substituting its own theory as to why some of the statements might have been permissibly admitted. The majority's conclusion as to relevance to motive is undermined by the fact that we are to review the ruling of the District Court, which held that "[e]vidence that Defendant had knowingly possessed firearms at other times is proper to prove knowledge and intent and not excludable under Rule 404(b)." App. 5. This is the ruling that we are to review—not some hypothetical alternative ruling that the District Court might have made. It is true that the Government argued the motive theory, briefly, before the District Court, and it advances that theory before us as well. The District Court did

---

[4] We have noted that the probative value of prior bad acts evidence "is significantly less" when the defense is that the defendant did not perform the charged act at all. *United States v. Daraio*, 445 F.3d 253, 265 (3d Cir. 2006) (quoting *United States v. Jemal*, 26 F.3d 1267, 1273 n.3 (3d Cir. 1994)).

[5] The District Court did refer to "state of mind, knowledge, motive or intent" in its instructions to the jury. App. 596.

8

not admit the statements as relevant to Lee's motive. Indeed, the fact that this theory was advanced by the Government, but *not* relied upon by the District Court in its ruling, actually suggests that the District Court rejected this rationale.[6] Accordingly, we must consider the District Court's stated rationale for admitting the statements: that "[e]vidence that Defendant had knowingly possessed firearms at other times is proper to prove knowledge and intent." App. 5.

As the majority convincingly argues, the knowledge and intent rationales for admitting the statements do not hold water:

> Lee's trial . . . was not about whether he knew that he had a rifle

---

[6] The majority writes: "By offering motive as a basis on which the jury could consider the evidence, the District Court necessarily concluded that motive was a proper basis for admission of one or more of the statements." Majority Op. 34 n.19. Although this inference might make sense in theory, it is not appropriate here. The District Court instructed the jury that it could consider the statements for state of mind, knowledge, motive, intent, or absence of accident or mistake. App. 596. But there is no reason to suppose that the District Court concluded that, for example, *absence of accident or mistake* was a proper basis for admission. Rather, it seems that the District Court was simply reciting the litany of potentially proper purposes. More to the point, if the District Court concluded that motive was a proper basis for admission, it should have said so.

9

in the back seat of his Jeep. There
was no question of accident or
mistake. Rather, Lee's defense was
simply that there was no rifle in his
Jeep and that the rifle recovered at
the Apartments was not his. . . .
Lee has not put knowledge at issue.
Lee is not arguing that he did not
know there was a rifle in his back
seat. His argument is a
straightforward denial that any gun
was there.

Majority Op. 32. Thus, evidence going to either knowledge or
intent is not "relevant" as required by *Huddleston*'s second
prong, a fact the majority implicitly recognizes in a footnote.
Majority Op. 31 n.18. I conclude, therefore, that the two
statements were admitted for an improper purpose.

We might be able to somehow justify the admission of
these statements, albeit for the wrong reason, were it not for the
importance we have placed on having the trial court draw the
jury's attention to the specific aspect of the case to which the
particular evidence relates. In *United States v. Sampson*, the
Government urged the admissibility of a prior drug conviction
as demonstrating "plan or scheme" and "refuting an accident or
mistake" defense. 980 F.2d 883, 885 (3d Cir. 1992). The trial
court indicated that the evidence "fall[s] within the purview of
the exceptions listed in 404(b)," and instructed the jury that
"[y]ou may consider the defendant's prior convictions only as
they relate to proof of motive, opportunity, intent, preparation,

10

plan, knowledge, identity, or absence of mistake or accident, and not for any other purpose." *Id*. at 888-89. We reversed and remanded, after concluding that both the ruling and the instructions were flawed, and, furthermore, that the Rule 403 balancing required under Rule 404(b) was not apparent from the record. *Id*. Regarding the trial court's ruling, we said:

> The district court, if it admits the evidence, must in the first instance, rather than the appellate court in retrospect, articulate reasons why the evidence also goes to show something other than character. Unless the reason is apparent from the record, a mere list of the purposes found in Rule 404(b) is insufficient. The district court must put a chain of inferences into the record, none of which is the inference that the defendant has a propensity to commit this crime.

*Id*. at 888.[7] As to the instruction to the jury, we said:

_____

[7] Contrary to the majority's contention that the reason for admission would have been apparent from the record, Majority Op. 34 n.19, I submit that the jury would not readily understand that the gun feud evidence was relevant to, and only to, Lee's motive.

11

This instruction does not cure the error. Where the government has not clearly articulated reasons why the evidence is relevant to any legitimate purpose, there is no realistic basis to believe that the jury will cull the proper inferences and material facts from the evidence. By simply repeating the entire litany of permissible theories under Rule 404(b), the judge's instruction gave the jury inadequate guidance. It also failed to limit the government to the theories it proffered in support of admission of the evidence.

*Id*. at 889. As to the balancing of probative value versus prejudice, we noted:

When a court engages in a Rule 403 balancing and articulates on the record a rational explanation, we will rarely disturb its ruling. Where, however, the court failed to perform this analysis, or where its rationale is not apparent from the record, there is no way to review its discretion.

12

*Id*. at 889 (citation omitted).  We concluded:

> In sum, we are not holding that the evidence of Sampson's prior drug convictions is not relevant to a proper purpose. We simply hold that a legitimate relevance has not been properly demonstrated and that the record does not show that the court conducted a Rule 403 balancing.  In the new trial, if the government again tries to introduce the evidence, it must carry the burden of proffering a rational chain of inferences and the district court must then evaluate the given reasons in the context of the developing case and give the rationale for its ruling.  We will reverse and remand for a new trial.

*Id*.  Thus, we held in *Sampson* that the district court must identify the proper purpose and instruct the jury as to exactly how it should use the evidence.[8]  That did not occur here.

---

[8] The Third Circuit Manual of Model Jury Instructions makes this same point, instructing judges to "describe the *precise* purpose or purposes for which the other act evidence was admitted," and to "[p]ick those of the following, or other reasons, that apply," followed by a list of example reasons,

Instead, the District Court instructed the jury reciting the litany of possible proper purposes: "You may consider this evidence only for the purpose of deciding whether the defendant had the state of mind, knowledge, motive or intent necessary to commit the crime charged in the indictment, or did not commit the acts for which he is on trial by accident or mistake." App. 596. The Rule 403 balancing was a single statement in the District Court's ruling: "Additionally, such evidence is highly probative and not excludable under Rule 403 as its prejudicial effect does not outweigh its probative value." App. 5.

---

including state of mind, knowledge, intent, motive, opportunity, preparation, planning, modus operandi, absence of accident or mistake, and identity. Third Circuit Mod. Crim. Jury Instr. 4.29 (emphasis added). The Comment to the Model Instructions also stresses that the "instruction should not merely include a laundry list of permitted uses of other act evidence. Rather, it should specifically state the limited purpose for which the other act evidence is admitted." Third Circuit Mod. Crim. Jury Instr. 4.29 cmt. (citing Michael H. Graham, *Handbook of Federal Evidence*, § 404.5 n.56 (5th ed. 2001)).

The majority suggests that the District Court's instruction "followed nearly word-for-word our Circuit's model 404(b) instruction." Majority Op. 40 n.25. Although it is true that the words the District Court used are found in our Circuit's model instruction, the District Court failed to do as the manual advises, namely, to "describe the precise purpose" for which the other act evidence was admitted, and to "pick" the reasons that apply.

14

Although our review standard is extremely deferential,[9] we should be hard-pressed to approve of the District Court's ruling as to the admissibility of even the motive evidence when the District Court failed to identify the correct purpose, conduct the Rule 403 balancing with reference to the correct purpose, or draw the jury's attention to the purpose that even the majority concludes was the only permissible purpose, namely, motive. I conclude that, in light of the plain language of Rule 404 and our ruling in *Sampson*, the District Court did err here because the reasoning, instructions, and balancing were inadequate as to the "motive" statements. I also conclude that, even if arguably relevant to some proper purpose, the extremely prejudicial nature of these statements outweighed any probative value under the Rule 403 prong. The majority never addresses the issue of prejudice, but as I noted above, when the crime pertains to guns I suggest that painting the defendant's character and past as effectively gun-filled is prejudicial indeed. As to the rest of the statements, they did nothing other than reinforce the notion that Lee is the type of person who possesses guns, shoots them at people, carries them in his car, and has run-ins with, and evades, law enforcement. This testimony had no proper purpose or probative value whatsoever.

---

[9] While we are to be deferential to the trial court and review for abuse of discretion, here the District Court did not admit any of the statements for a proper purpose under Rule 404, and violation of the Rule is an abuse of discretion. "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 99 (1996).

15

Given the damning nature of these statements, I think it very difficult to conclude that the introduction of these statements was harmless. The majority correctly notes that the appropriate test for 'harmlessness' is "whether it is highly probable that evidentiary error did not contribute to conviction." Majority Op. 36 (citing *United States v. Ali*, 493 F.3d 387, 392 n.3 (3d Cir. 2007) (citing *Gov't of V.I. v. Toto*, 529 F.2d 278, 283-84 (3d Cir. 1976))). But, we have also stated that an appropriate standard for "errors affecting nonconstitutional trial rights," as in this case, is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *United States v. Toliver*, 330 F.3d 607, 612 (3d Cir. 2003) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). These two statements of the test are both borne of the Supreme Court's reasoning in *Kotteakos*. In *Government of the Virgin Islands v. Toto*, the case from which the majority draws its test, we noted that "[w]e are thus required to apply in this case the test of *Kotteakos*. We must decide 'whether the error itself had substantial influence (on the minds of the jury.) [sic] If so, or if one is left in grave doubt, the conviction cannot stand.'" 529 F.2d at 283 (citing *Kotteakos*, 328 U.S. at 765). We also noted that "stating the test is easier than applying it," *id.*, which remains true even if we focus only on the question of whether it is highly probable that evidentiary error did not contribute to conviction. It is worth returning to *Kotteakos* for guidance, as the Supreme Court eloquently expounded on the proper way in which we, the reviewing court, should assess whether an error was "harmless" in the context of determining the effect of errors in a criminal case:

> [I]t is not the appellate court's

16

function to determine guilt or innocence. Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. Appellate judges cannot escape such impressions. But they may not make them sole criteria for reversal or affirmance. Those judgments are exclusively for the jury, given always the necessary minimum evidence legally sufficient to sustain the conviction unaffected by the error.

But this does not mean that the appellate court can escape altogether taking account of the outcome. To weigh the error's effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum. In criminal causes that outcome is conviction. This is different, or may be, from guilt in fact. It is guilt in law, established by the judgment of laymen. And the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict.

It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.

This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record.

If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with fair

assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

328 U.S. at 763-65.

Accordingly, we are not to look solely at the quality or quantum of the evidence of guilty ("whether there was enough to support the result," *id*. at 765), but "even so" did the error have "substantial influence." Here, the other evidence of guilt was not overwhelming; every aspect was a judgment call: Was Digger's reaction a clear identification that the rifle in the woods was Lee's rifle? Was what Officer Kraus saw in Lee's car, during the brief time it was stopped, a rifle? Lee was never seen in the woods; he was found in an apartment, hiding in a couch, two weeks later. There was no forensic evidence or eyewitness who ever saw Lee with the gun in question, or who could identify the gun as Lee's. If the jury knew nothing about Lee, would it have been more likely to have had reasonable doubt

19

and acquit? Did the statements detailing Lee's extensive experience with guns, and prior criminal activity known to Officer Kraus, sway or influence the jury?[10] "If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand." *Id*. at 764. In light of the nature of the other evidence, and the nature of the statements, I do not have this "conviction," and am left in "grave doubt." I would thus conclude that the error was not harmless and that a new trial is warranted.

---

[10] It is worth noting that, since the statements were presented as coming from Lee himself, additional concerns arise. In a different context, the Supreme Court has stated "admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (citation omitted). *Fulminante* dealt with the admission of a coerced confession; here, we have no issue of coercion. However, because it was reported by Kraus (whose credibility was a central concern in the case), and it was not committed to writing or acknowledged by Lee, we arguably face similar concerns as to reliability: "the risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless." *Id*.