NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-2267

_____

UNITED STATES

v.

JOHN KELVIN CONNER,
                                        Appellant

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-18-cr-00542)
District Judge: Honorable Gerald A. McHugh

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 30, 2020

_____

Before: GREENAWAY, JR., PORTER, and MATEY, *Circuit Judges*.

(Opinion Filed:  April 29, 2020)

———————

OPINION*

———————

GREENAWAY, JR., *Circuit Judge*.

Fraud, by definition, involves deception. This case involves two instances of deception: one perpetrated by Appellant John Kelvin Conner against Sarah Fauntleroy, an elderly woman who trusted Conner to act as her power of attorney, and a second against himself. In challenging his judgment of conviction, Conner has apparently convinced himself that the phrase "Give credit where credit is due" applies to remedial steps taken even after one's misdeeds have come to light. Conner cannot prevail on the strength of such revisionist history.

On February 1, 2019, a jury found Conner, a former federal agent and attorney, guilty of 19 counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of making a false statement to federal agents, in violation of 18 U.S.C. § 1001. On May 23, 2019, the District Court sentenced Conner to 46 months' imprisonment and ordered restitution in the amount of $14,932.86.

———————————

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

On appeal, Conner challenges both his conviction and his sentence. As to his conviction, he contends that the District Court erred in admitting Ms. Fauntleroy's prior testimony against him, given her unavailability to be cross-examined at trial. As to his sentence, Conner contends that the District Court erred in failing, in its calculation of the loss attributable to his fraudulent scheme, to give him credit for $90,708.15 worth of funds that he deposited into Ms. Fauntleroy's account. These funds consisted of $23,000 deposited before Ms. Fauntleroy became aware of his scheme and $67,708.15 deposited after she had learned of his scheme. The Government concedes that the District Court erred in not crediting $23,000 in deposits that occurred before Conner's scheme came to light and agrees that the restitution order should be reduced by that amount.

For the following reasons, we will affirm the District Court's evidentiary ruling, vacate Conner's sentence, and remand for resentencing consistent with this decision.

## I. Background

### A. Conner's Fraud

In March 2016, Conner and Fauntleroy met through Fauntleroy's 96-year-old brother. In 2015, Fauntleroy suffered a stroke after which she became dependent on round-the-clock care. Short on cash, Fauntleroy relied on her brother's recommendation that she retain Conner to help. Conner signed a power of attorney agreement (the "POA Agreement") with Fauntleroy, which authorized him to manage Fauntleroy's finances and to pay her bills. The POA Agreement required Conner to exercise the power of

3

attorney "for the benefit" of Fauntleroy, to keep his assets separate from Fauntleroy's, and to "exercise reasonable caution and prudence." App. 451, 885.

Upon assuming control of Fauntleroy's assets, Conner promptly violated each of these terms. As the first step of his fraudulent scheme, Conner consolidated Fauntleroy's cash assets into two Wells Fargo accounts. Conner requested $10,000 from Fauntleroy's brother, which Conner deposited into Fauntleroy's Wells Fargo checking account. Conner then added himself as signatory to Fauntleroy's Wells Fargo checking account, opened a new Wells Fargo savings account for which he also made himself a signatory, and applied for and obtained a Wells Fargo rewards card, all purportedly on behalf of Fauntleroy. Around the same time, Conner assumed control of an annuity that Fauntleroy had set up at Delaware Life Insurance Company ("Delaware Life") for her niece. The value of the annuity was $112,794.58. Conner then directed Delaware Life to liquidate the annuity and to transfer all the funds to the Wells Fargo savings account that Conner had opened in Fauntleroy's name.

Having consolidated Fauntleroy's assets into the Wells Fargo accounts, Conner used Fauntleroy's money to fund his gambling habit. On the same day that Fauntleroy had to be hospitalized for a medical condition, Conner used Fauntleroy's Wells Fargo card to withdraw $200 in cash that he used for gambling at the Parx Casino in Pennsylvania. After losing the first $200, Conner withdrew an additional $60 from Fauntleroy's Wells Fargo accounts. Over approximately eight months, Conner made at

4

least 176 withdrawals from Fauntleroy's Wells Fargo checking account at four different casinos in Pennsylvania and New Jersey. He made these funds available to himself via transfers that he initiated from Fauntleroy's Wells Fargo savings account to her checking account. Fauntleroy's savings account is the same account where Conner deposited the $10,000 from Fauntleroy's brother and the $112,794.58 from the now liquidated annuity at Delaware Life. On January 25, 2017, Conner made his final transfer from Fauntleroy's savings account to her checking account. By that time, Fauntleroy's savings account only had $261.30.

Conner also made cash withdrawals from Fauntleroy's accounts at locations other than casinos. In total, including the transactions at casinos and other debits, Conner's actions resulted in $105,632.01 debited from Fauntleroy's Wells Fargo accounts.

Conner did, however, make several deposits into Fauntleroy's Wells Fargo accounts. On December 28, 2016, after he had already withdrawn $65,976.35 at casinos, Conner deposited $2,000 into Fauntleroy's checking account. In total, before Fauntleroy discovered his fraudulent scheme, Conner had deposited a total of $23,000 into her Wells Fargo accounts.

As he was spending his time and Fauntleroy's money at casinos, Fauntleroy's financial situation withered significantly. On multiple occasions, checks that Conner wrote to Fauntleroy's caretakers bounced. Fauntleroy's live-in caretaker testified that due to Conner's neglect, Fauntleroy lost electricity at one point and that her water supply

5

was almost suspended. By April 24, 2017, Fauntleroy's Wells Fargo checking account had only $15.07, and her savings account was empty.

Her accounts thus depleted, Fauntleroy, with the assistance of her caretaker and her family, removed Conner as her power of attorney and removed him as a signatory on her Wells Fargo accounts. Thereafter, Fauntleroy and her family refused to have contact with Conner. Thus rebuffed, Conner, using funds that had come from his wife's bank account, mailed Fauntleroy a certified check for $67,708.15.

### B.    Disciplinary Board Proceedings

On September 30, 2017, Fauntleroy filed a complaint with the Office of Disciplinary Counsel ("ODC") for the Disciplinary Board of the Supreme Court of Pennsylvania, alleging that Conner had abused his power of attorney privileges. The ODC subsequently mailed Conner a letter notifying him of the complaint. Conner responded to the ODC and admitted to making the withdrawals from Fauntleroy's accounts at casinos but explained that he "requested and received permission from Ms. Fauntleroy" to do so. App. 30.

On June 21, 2018, the Disciplinary Board held a hearing (the "ODC hearing") at which Conner represented himself and, through that representation, personally cross-examined Fauntleroy. Although Fauntleroy's direct testimony was brief, spanning only three pages of the hearing transcript, Conner devoted considerable time to his cross-

6

examination of her, which comprises approximately 52 pages of the hearing transcript. After a short re-direct, Conner declined to conduct a re-cross examination.

### C.    Conner's FBI Interview

On August 24, 2018, two FBI agents met with Conner at his home. During the meeting, Conner acknowledged again that he had withdrawn cash from Fauntleroy's accounts, but he explained that he had done so because she owed him for services he had provided to her. At the end of the interview, one of the agents gave Conner his contact information, a subpoena, and a target letter. Following the interview, Conner called the Assistant U.S. Attorney listed on the subpoena who then initiated a conference call with the same two FBI agents. During this call, Conner told the agents that he and Fauntleroy had an oral agreement that he could borrow money from her accounts for his personal use at casinos. Conner further stated that he and Fauntleroy had reached such an agreement "numerous times" both in-person and by telephone. He explained that these conversations were in private and that no one else was privy to this oral agreement.

### D.    Conner's Jury Trial

On November 29, 2018, a grand jury indicted Conner on 19 counts of wire fraud, in violation of 18 U.S.C. § 1343, and one count of making false, fictitious, and fraudulent statements to FBI agents, in violation of 19 U.S.C. § 1001. On January 11, 2019, the Government filed a motion in limine to admit the prior sworn testimony of Fauntleroy

whose health issues, the parties agreed, had made her an unavailable declarant. After hearing argument, the District Court granted the Government's motion. App. 1231.

On January 29, 2019, the District Court held a jury trial. During trial, the Court read into the record Fauntleroy's prior sworn testimony. Conner therefore did not have an additional opportunity cross-examine Fauntleroy. On February 1, 2019, the jury found Conner guilty on all counts.

On May 23, 2019, the District Court sentenced Conner to 46 months' imprisonment followed by three years' supervised release. In stating the reasons for the sentence imposed, the District Court adopted the Guidelines calculation set out in the Presentence Investigation Report ("PSR"), to which neither party objected. The PSR advised that the total intended loss attributable to Conner's fraud was $105,632.01. The PSR also advised that Conner's total offense level was 21. Taken together with his criminal history category of I, the advisory Guidelines range for his crimes was 37 to 46 months' imprisonment. In deciding to sentence Conner at the top of this range, the District Court explained that Conner's gambling addiction did not excuse his severe betrayal of trust and violation of his duty as an attorney and officer of the court to vulnerable people such as Fauntleroy.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(2).

We review for plain error alleged defects in sentencing procedure that the defendant failed to raise before the District Court. *United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006). The defendant bears the burden to establish plain error, which requires a showing that the District Court committed (1) "an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; [and] (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings." *United States v. Lee*, 612 F.3d 170, 178 n.6 (3d Cir. 2010) (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)). If the defendant established plain error, then we may exercise our discretion to award relief only if the defendant is "actually innocent" or the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732, 736 (1993) (internal quotation marks and citations omitted).

We review the District Court's decision on the admissibility of evidence for abuse of discretion. *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000). On the other hand, where "a defendant fails to raise a Sixth Amendment claim in the district court, we review for plain error." *United States v. Shaw*, 891 F.3d 441, 454 (3d Cir. 2018).

III. **Discussion**

    A.     **The Loss Attributable to Conner's Fraud**

Conner first contends that we should vacate his sentence because the District Court erred by failing to give credit for the $90,708.15 that he returned to Fauntleroy. This amount consisted of $23,000 in deposits made before Fauntleroy became privy to his fraud and the $67,708.15 cashier's check that he mailed Fauntleroy after his fraud had come to light. For the following reasons, we find that this argument has merit only as to the $23,000 in deposits.

The Sentencing Guidelines provide for an eight-level increase to the base offense level in cases where the intended loss attributable to the defendant's crime is more than $95,000 and less than $150,000. U.S.S.G. § 2B1.1(b)(1)(E). Because the District Court calculated the intended loss attributable to Conner's fraud as $105,632.01, it applied the eight-level increase to Conner's sentence. Importantly, the notes to the Sentencing Guidelines state that, in calculating the total intended loss attributable to an offense, the "[l]oss shall be reduced by . . . money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 app. note 3(E), (i). The notes define the "[t]he time of detection of the offense" as "the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency." *Id.*

Based on the plain text of the Sentencing Guidelines, the District Court should have reduced the loss attributable to Conner's $23,000 in deposits before his fraud was detected but correctly denied Conner credit for the $67,708.15 cashier's check that he sent afterward. As to the $23,000, the Government argues that Conner only deposited that money into Fauntleroy's accounts to ensure that the accounts had sufficient cash to continue funding his gambling addiction. Nonetheless, the Government concedes that the District Court should have credited this amount against the loss attributable to his fraud.

We believe the $23,000 credit is appropriate for two reasons. First, the Sentencing Guidelines do not consider the motivation behind the defendant's decision to return the funds, so long as the return occurred before detection of the crime. Second, but for the fact that Conner deposited the $23,000 back into Fauntleroy's accounts, Conner could not have taken $105,632.01 total from those accounts for his personal use.[1] Accordingly, we find that the District Court's failure to credit this $23,000 against the loss attributable to Conner's crime was an obvious error that affected Conner's substantial rights and "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732.

We agree with the District Court that Conner is not entitled to credit for the $67,708.15 cashier's check that he sent to Fauntleroy on May 1, 2017. The key question

---

[1] Fauntleroy does not challenge the District Court's loss calculation as to the remaining $14,923.86.

11

here is whether Conner sent this check after either Fauntleroy or the FBI had detected his fraud or Conner knew or reasonably should have known that Fauntleroy or the FBI had detected his fraud. Conner argues that this fact was not considered at sentencing and that the District Court entered no findings of fact on this point. Conner's argument is meritless.

The District Court clearly stated that it was adopting the facts set out in the PSR. These facts included that (1) Fauntleroy removed Conner as her power of attorney on April 28, 2017; (2) upon learning of Fauntleroy's decision, Conner tried to contact Fauntleroy, her caretaker, and her brother, but was rebuffed in each instance; (3) only after each of these actions, did Conner mail the check to Fauntleroy.

Conner failed to object to these findings of fact, and our precedent permits "a sentencing court [to] rely on the facts set forth in the presentence report when their accuracy is not challenged by the defendant." *United States v. Foster*, 891 F.3d 93, 113–14 (3d Cir. 2018). These facts clearly support a finding that Fauntleroy had detected Conner's fraud by May 1, 2017 or, at the very least, that Conner "knew or reasonably should have known that the offense was detected or about to be detected by" Fauntleroy. U.S.S.G. § 2B1.1 app. note 3(E)(i)(II). We therefore decline to find that the District Court committed error, let alone plain error, in deciding not to reduce the loss attributable to Conner's fraud by the $67,708.15 cashier's check he sent to Fauntleroy.

12

Accordingly, we will remand the case back to the District Court for resentencing with instructions to credit $23,000 against the loss attributable to Conner's fraud. The total loss, therefore, should be entered as $82,632.01. We leave the Guidelines calculation to the District Court, consistent with our findings here.

**B.      The Admission of Ms. Fauntleroy's Prior Testimony**

Conner next contends that the District Court erred in admitting at trial Fauntleroy's prior sworn testimony before the ODC. Neither party disputes that Fauntleroy was unavailable to testify at trial. Instead, Conner contends that the District Court abused its discretion in admitting Fauntleroy's testimony under Federal Rule of Evidence 804(b)(1) because he did have an opportunity, and similar motive, to develop Fauntleroy's testimony at the ODC hearing by cross examination. In addition, he argues that even if the District Court did not abuse its discretion under Rule 804(b)(1), his Sixth Amendment right to confront a witness against him was violated because Fauntleroy's testimony "lacked any indicia of reliability." Appellant Br. at 28–32. Each of Conner's arguments is easily dispatched.

First, as to Rule 804(b)(1), Conner urges us to find that his motive in developing Fauntleroy's testimony at the ODC hearing was not similar to the motive he would have had in developing her testimony at trial. Specifically, Conner contends that at the ODC hearing his motive "was to develop testimony to establish that he did not violate his fiduciary duties under the power of attorney and that he did not violate his fiduciary

duties under the power of attorney and that [Fauntleroy] authorized all transactions, including his personal use of her funds." Appellant Br. at 25. That motive, Conner contends, contrasts with his motive at trial, which was "to develop evidence that would establish that he did not devise or participate in a wire fraud scheme to steal her funds." *Id.* at 25–26. Conner conveniently skirts over the fact that the Government's theory for how Conner perpetrated this wire fraud against Fauntleroy was precisely through the abuse of his fiduciary relationship with Fauntleroy. That relationship, Conner acknowledges, was a subject he had motive to explore through examination at the ODC hearing. Accordingly, during his extensive cross-examination of Fauntleroy, Conner had the incentive to attack Fauntleroy's credibility and to cast doubt on her testimony that she never authorized Conner to use her money to fund his gambling habit, that he never requested such authorization, and that she would not have granted it had he done so. That is all our precedent requires. *See Kirk v. Raymark Indus., Inc.*, 61 F.3d 147, 166 (3d Cir. 1995) ("The similarity of motive requirement assures that the earlier treatment of the witness is the rough equivalent of what the party against whom the statement is offered would do at trial if the witness were available to be examined by that party." (internal quotation marks and citations omitted)).

Second, Conner also argues that the District Court erred in applying Rule 804(b)(1) because he did not have an opportunity to cross-examine Fauntleroy at the ODC hearing. That is so, he argues, because he did not receive a copy of Fauntleroy's

complaint against him or her prior statements until 15 minutes before the hearing began. *Id.* This argument fails, however, for several reasons, including that (1) Conner does not point to any inconsistent statement or allegation in the complaint that he did not attempt to develop through cross-examination; (2) even if he had done so, "prior opportunity" to develop a witness's testimony does not mean that the defendant had to have access to all potentially useful evidence during the witness's earlier testimony; and (3) here, Conner did have access to Fauntleroy's complaint, even if only for a short time before the hearing. Contrary to Conner's arguments, the record reflects that Conner conducted a thorough cross-examination of Fauntleroy that touched on the same subject matter covered by his criminal case. This opportunity to cross-examine Fauntleroy, despite the different type of hearing, is sufficient to satisfy that requirement under Rule 804(b)(1). *See Kirk*, 61 F.3d at 164 ("[T]estimony must be taken at a hearing, deposition, or civil action or proceeding.").

Third, Conner lastly contends that admitting Fauntleroy's prior testimony also violated his Sixth Amendment rights because her testimony was unreliable. This argument is also unavailing. At the outset, we note that because Conner did not raise this argument below, we review for plain error. A careful review of the record reveals no such error here. Conner fails to cite any case law that testimony admissible under Rule 804(b)(1) may nonetheless violate the Sixth Amendment if the defendant can show that it is unreliable. To the contrary, the admissibility of former testimony does not hinge on

15

indicia of reliability. *See Crawford v. Washington*, 541 U.S. 36, 68–69 (2004). Even if he had cited such case law, he could not show that "the error is clear or obvious, rather than subject to reasonable dispute." *Lee*, 612 F.3d at 178 n.6 (internal quotation marks and citations omitted). Indeed, Conner's repeatedly urged the jury to find Fauntleroy's testimony unreliable. *See* App. 1117–19, 1134–39. Despite those arguments and Conner's own testimony, the jury, in voting to convict on all 20 counts, apparently did not find Fauntleroy's testimony unreliable such that we can find clear or obvious error here.

Accordingly, we find that the District Court neither abused its discretion under Rule 804(b)(1) nor committed plain error when it admitted the prior sworn testimony of Fauntleroy. We therefore reject Conner's arguments that his judgment of conviction should be overturned.

## IV.    Conclusion

For the foregoing reasons, we will affirm Conner's judgment of conviction. We will vacate his sentence, however, and remand the case to the District Court for resentencing consistent with the rulings in this decision.